[No. 31396. Department Two. March 22, 1951.]

MICHAEL MARTIN et al., *Respondents,* v. KENNETH K. SIKES, *Appellant.*[1]

*Dodd & Russell,* for appellant.

*Kelley, O'Sullivan & Myers,* for respondents.

ROBINSON, J.—This is an action brought to recover for the alleged conversion of a milking machine worth four hundred fifty dollars. From a judgment in favor of the plaintiffs, defendant has taken this appeal.

Respondent Michael Martin was formerly the tenant on a dairy farm belonging to appellant, Kenneth K. Sikes. At

[1]Reported in 229 P. (2d) 546.

the time his lease was executed, he purchased from Sikes the milking machine which is the subject of this appeal. It was his impression that the pipeline used with the milking machine was included within the purchase. Sikes did not share this impression. The parties were unable to get along together satisfactorily, and Martin's lease was eventually terminated by mutual agreement. Sikes heard that Martin planned to take the pipeline with him when he left the farm, and wrote him a letter, reading in part:

"If you . . . remove any of the milking machine pipe and stall cocks from the barn, or any of the wiring installations from the house, or any other of my personal property, you will be promptly arrested and charged with Grand Larceny by the King County Prosecutor, . . . You will then be dealt with according to law."

Martin did not communicate with Sikes upon receipt of this letter, and, on February 27, 1948, Sikes consulted with Judge Edward H. Wright, justice of the peace for the Cherry Valley precinct, and signed a criminal complaint, drawn by Judge Wright, to be used as the basis for a warrant to keep the peace. This complaint read, in part, as follows:

"IN JUSTICE'S COURT
"Cherry Valley Precinct, King County, Washington
"THE STATE OF WASHINGTON ⎫       No. 230
          vs.     ⎬   Criminal Complaint
"Mike Martin         ⎭ For     Keep the Peace

"Before me Edward H. Wright, a Justice of the Peace, in and for the said County, this day personally appeared Kenneth Sikes who, being first duly sworn on oath complains and says: That on the 27th day of February, 1948, at ........................................, in the County of King and State of Washington, Mike Martin did threaten to take and injure property of complainant, to wit: *milking machine and installations,* the same being upon the farm of complainant in said King County. . . .

"Wherefore said complainant prays that the said defendant Mike Martin may be arrested and dealt with according to law.
(Italics ours.)         [Signed]     Kenneth Sikes"

It will be observed that this complaint asserts the ownership of the milking machine to be in Sikes, although it is conceded by all that this unit, as distinguished from the pipeline, was the property of Martin. How this error came to be made is not entirely clear. Judge Wright took the blame for it, stating that he was not a farmer and that he knew nothing about milking machines. He said of the complaint that, instead of saying "milking machine and installations," it should have said "milking machine installation," but that he had not understood this at the time it was drawn up. Sikes stated that he never intended to claim anything but the pipeline; but he signed the complaint, and, in addition, Judge Wright testified that he read it to him before he did so.

Pursuant to the signing of this complaint, a warrant was issued and delivered by Judge Wright to L. J. Landers, a deputy sheriff. Landers then went to see Martin at the farm. The two were not entirely in accord as to what occurred there, but Martin testified as follows:

"He gave me this warrant and asked me to read it. After I had read it he asked if I understood it. I told him I did but said 'The things I have here are my owner [sic] personal property.' He said 'The Judge don't think so.' I told him I could prove it. He said 'No ifs and ands about it, leave them all here or I will have to take you in.' I told him in that case I would have to leave them. I had a friend there helping me. Mr. Landers went over and argued with him. After they got through arguing I stopped the deputy and asked if he had authority to arrest me. He said he did. I asked on what authority and he said on the warrant. I asked him where he got it and he said from the Judge. He said the Judge had the authority. Then he looked up and saw the pipeline and asked whose it was. I said it was mine. He said 'Promise to leave that here too.' I said 'I will if you give me the warrant.' He said he could not do that, that he had to keep it, but I could go to the Judge and get my own. I said I would do it but I was not going to let Sikes get away with it. He said he didn't care what I did, that it was up to me and he had nothing to do with it, and then he left."

Landers testified that he then telephoned Judge Wright and arranged a meeting between him and Martin for that evening. The trial court found that Martin, in order to avoid arrest, promised to leave the milking machine on the farm and to call upon Judge Wright as arranged. In fact, however, Martin had already taken the machine to North Bend. Whether Martin told Landers of this was disputed. Although the trial judge made no finding of fact on the point, it can reasonably be inferred from the wording of the oral opinion that he was of the view that he did not.

When Martin called on Judge Wright that evening, he was told that, if he would not remove any of the property in question, a peace bond would not be required. Judge Wright testified that he was not concerned with the merits of this civil dispute, but wished only to be sure there would be no violence or breach of the peace. Upon Martin's assurance that he would leave matters "in *status quo*," therefore, Judge Wright gave him the original copy of the complaint, which he took with him. As a result of this conversation, Judge Wright testified that he did not docket the case, and destroyed all of the relevant papers. Martin averred that he told Judge Wright that the milking machine had already been taken to North Bend and that Judge Wright told him that it should stay on the farm. Judge Wright, however, testified positively that Martin never told him that he had moved the milking machine, and the trial court, in its findings of fact, found this to be the case. In any event, Martin, after his conversation with Judge Wright, procured a friend to bring the milking machine back from North Bend to the farm.

On the following day, Martin gave up possession of the farm. While he was engaged in moving some of his property, it appears that Sikes asked him whether he was not going to take with him either the milking machine, according to one version of the conversation, or the compressor, which was a part thereof, according to another. Appellant's witnesses testified that, Martin refused to discuss the matter; respondents' witnesses indicated that Martin said he

could not move this property because he had told Judge Wright he would not. Whatever the truth of the matter, it is clear that Martin refused to take the property with him, or to treat it as any longer belonging to him.

May appellant, Sikes, be held liable as a converter of the milking machine? The trial judge thought so, and, accordingly, entered judgment in favor of Martin for the full value of the machine at the time of the alleged conversion.

The question of what constitutes conversion is no easier of solution at the present day than it was at the time of Baron Bramwell, who remarked that, "after all, no one can undertake to define what a conversion is." *Burroughs v. Bayne,* 5 H. & N. 296, 29 L. J. Ex. 185 (1860). The restatement has made no attempt at a definition. Restatement, Torts, p. 572, § 223. But one English authority has set forth the following:

"A conversion is the act of wilfully interfering with any chattel, without lawful justification, whereby any person entitled thereto is deprived of the possession of it." Salmond on the Law of Torts (9th ed.) 310, § 78.

Other writers have emphasized loss of possession on the part of the plaintiff as a necessary element of the wrong of conversion. Warren, Trover and Conversion, p. 31; Scarborough, Test of Conversion in Tort, 1 N. J. L. Rev. 5, 12. See Bowers, The Law of Conversion, p. 216, § 298. So, also, have numerous cases. *Traylor v. Horrall,* 4 Blackf. (2d ed.) (Ind.) 353; *Heighes v. Dollarville Lbr. Co.,* 113 Mich. 518, 71 N. W. 870; *Thorp v. Robbins,* 68 Vt. 53, 33 Atl. 896.

On the other hand, it is quite clear that, to support an action for conversion, it is not always necessary to show that the defendant himself has personally acquired the possession, as when he has made an unauthorized sale of the plaintiff's property and the buyer thereof has taken possession (*Ramsby v. Beezley,* 11 Ore. 49, 8 Pac. 288; *Bickford v. Hupp,* 83 Wash. 427, 145 Pac. 454); or, in some circumstances at least, where the defendant has participated in the wrongful act of a third party who himself has taken possession, to the extent of aiding or abetting the consummation of the wrong

(*Continental Gin Co. v. De Bord,* 34 Okla. 66, 123 Pac. 159; *Clark v. Whitaker,* 19 Conn. 319, 48 Am. Dec. 160). Furthermore, in some special situations, it has been held that it is not even necessary that the plaintiff be deprived of *physical* possession in order that a conversion be held to have taken place.

Thus, many courts, though, as we shall show, by no means all, have held that conversion will lie for an unjustified levy under legal process, even though possession is not otherwise disturbed and no sale is made pursuant to the levy. *Kloos v. Gatz,* 97 Minn. 167, 105 N. W. 639; *Connah v. Hale,* 65 N. Y. Com. Law (23 Wend.) 460; *Phillips v. Hall,* 50 N. Y. Com. Law (8 Wend.) 610. These decisions may be explained on the theory that the levying officers, acting in the name of the law, took over, not actual possession, it is true, but *constructive* possession, pursuant to the authority of their writs of attachment. Unquestionably, the plaintiffs continued in nominal possession, but, in the view of these cases, all of the rights incident to the normal ownership of property were taken away from them by the levies. They were left with no more authority over their goods than if they had previously been total strangers to them, and the attaching officer had merely deposited them in their care.

The leading case is *Johnson v. Farr,* 60 N. H. 426. There, a lot of last-blocks, the property of the plaintiff, was wrongfully levied on by the defendant sheriff, pursuant to the terms of a writ issued against a third party. The sheriff never took physical possession of the blocks, nor were they moved; but the plaintiff successfully brought trover, alleging that they had nevertheless been converted. Though it is difficult to agree with all of the implications of this opinion, the following excerpt sets forth the reasons justifying a finding of conversion in this type of case as well as they have anywhere been expressed:

"To constitute a valid attachment of personal property, it must be taken into the possession or be placed under the control of the officer. [Citing cases.] Hence, it is to be assumed that the defendant took possession of these blocks, or placed them under his control; and if he did, it follows that

to the extent of his possession and dominion the plaintiffs were necessarily excluded and devested. And we see no reason why such exclusion was not total; for the only object of an attachment of movable property being to take the property attached out of the possession and custody of the alleged debtor and transfer it to the possession and custody of the law, acting through its officer, he must, as against the debtor, be vested with the exclusive possession or custody of such property by the attachment, or its sole object would be defeated."

Partly, no doubt, because of the influence of such cases as these, which suggest that a conversion may take place even though there is no deprivation of physical possession, and also, perhaps, because of the realization that deprivation of possession, in itself, will not constitute a conversion without something more—there must be an intention on the part of the defendant to assert a right which is inconsistent with the plaintiff's right (*Clark v. Groger*, 102 Wash. 188, 172 Pac. 1164; Prosser on Torts, p. 102, § 15)—most American courts have not defined conversion in terms of possession, but, instead, in a possibly futile attempt to cover all conceivable contingencies, have adopted such definitions as that of Judge Cooley, which, it will be seen, employs interference with "dominion" as the test:

"Any distinct act of dominion wrongfully exerted over one's property in denial of his right, or inconsistent with it, is a conversion." 2 Cooley on Torts (4th ed.) 498, § 331.

The learned author continues, quoting in slightly altered form, an excerpt from 7 Bacon's Abridgement 792 (found in the seventh edition thereof), which has since been cited and relied upon in cases too numerous to mention:

" 'It is not necessary to a conversion that there should be a manual taking of the thing in action by the defendant; it is not necessary that it should be shown that he has applied it to his own use. Does he exercise a dominion over it in exclusion or defiance of the plaintiff's right? If he does, that in law is a conversion, be it for his own use or another person's use.' " 2 Cooley on Torts (4th ed.) 499, § 331.

The merit of such definitions as Judge Cooley's lies in the fact that they encompass most of the circumstances in which

it may be conceded that a conversion has taken place; but their chief defect is inherent in this very all-inclusiveness; for, taken too literally, they may be used to find conversion where none has in fact occurred. It is plain that, when the test of conversion ceases to be deprivation of the plaintiff's possession, and becomes, instead, exercise of dominion in defiance of the plaintiff's right, the number of situations in which conversion might conceivably be alleged is considerably increased. The phrase "exercising dominion" is so vague that it may mean anything. See note 47 L. Q. Rev. 168.

However, at this late date, one may not question the validity of these definitions. They are so generally accepted that they must be regarded as standard. Yet, save in perhaps a few isolated instances, an examination of the cases discloses that the courts, while giving them nominal adherence, have generally refused to find a conversion where the act of dominion involved amounted to no more than an assertion of title, unaccompanied by taking of at least *constructive* possession, either by the defendant or by someone else acting wholly or in part through his agency or on his behalf.

Thus, as far as can be determined, no one quarrels with the decision in *Guarantee Bond & Mortgage Co. v. Hilding*, 246 Mich. 334, 224 N. W. 643, where the defendant posted upon the windows of certain automobiles, notices stating that the vehicles in question belonged to him in his capacity as trustee in bankruptcy, and that they were not to be removed without his consent. He made no attempt to exercise further control of the property. It later appeared that the automobiles were not the property of the bankrupt, and the real owners brought suit, alleging conversion. A dissenting judge was of the opinion that such a conversion had taken place, on the ground that the defendant's act in posting the notices amounted to an unauthorized act of dominion over the property; but the majority, conceding that this result might be reached without exceeding the bounds of certain of the language used by courts and writers in defin-

ing conversion, nevertheless were of the view that, since no one took the automobiles into possession, or deprived the plaintiffs of them, the defendant's posting of the notices amounted to mere words which, being unsupported by acts, could not, in themselves, constitute a conversion.

And there are a number of instances where courts have refused to find conversion even where the act of the defendant would seem to have been even more palpably an exercise of dominion than the act involved in the *Hilding* case. Notable among these are the cases which, in contradistinction to those discussed above, have held that a mere wrongful levy on the part of the sheriff, without any actual interference with the owner's physical possession or use of the chattels involved, will not amount to a conversion; and this, notwithstanding the consideration, so strongly emphasized in *Johnson v. Farr, supra,* that the sheriff, in attaching property in this manner, takes it, in effect, into the custody of the law. In *Fernald v. Chase*, 37 Me. 289, the court recognized the rule that an exercise of dominion over the owner's property, in exclusion or defiance of his rights, is a conversion; but simply held that a mere levy, with nothing more, was insufficient to constitute such an exercise of dominion. See, also, *Bailey v. Adams,* 56 N. Y. Com. Law (14 Wend.) 201; *Rand v. Sargent,* 23 Me. 326, 39 Am. Dec. 625. Washington is in apparent accord with this view. *Hess v. Starwich,* 149 Wash. 679, 272 Pac. 75.

It should be apparent from the foregoing that, unless one is aware of the restricted meaning which the courts have actually given to the word "dominion" in undertaking to determine whether or not a defendant has interfered with a plaintiff's rights to such an extent as to make him liable for a conversion, the definitions employing this term are of little practical assistance in attempting to solve close cases. In spite of all the talk of "dominion," the question of whether or not the defendant, or someone else acting through his agency or on his behalf, has taken actual or constructive possession, would seem, in most cases, to provide the real key to the problem. It is true that, even if

this has occurred, there may still have been no conversion; but it can be said with safety that, if is has not, there has certainly been none.

Assertions to the contrary have been made. Winfield, Law of Tort, p. 389 *et seq.*, § 109; note, 24 Am. St. Rep. 795, 798. It cannot be denied that the reports contain an abundance of dicta so broad and general in scope that they might seem to lend support to these assertions. There are even a few holdings which, at least at first glance, appear to do so. *Oakley v. Lyster*, 1 K. B. 148; *Bristol v. Burt*, 7 Johns (N. Y.) 254, 5 Am. Dec. 264; *Donohue v. Shippee*, 15 R. I. 453, 8 Atl. 541. But, properly considered, the first two of these cases are probably not out of line with the general rule. Salmond on the Law of Torts (9th ed.), p. 320; Note, 47 L. Q. Rev. 168; Warren, Trover and Conversion, p. 33; Scarborough, Test of Conversion in Tort, 1 N. J. L. Rev. 5, 14. The third is generally regarded as having been in error. 1 Street, Foundations of Legal Liability, 243; Scarborough, Test of Conversion in Tort, 1 N. J. L. Rev. 5, 13.

The area of serious division and of conflict is reached in those cases in which an officer of the law has wrongfully levied on the plaintiff's goods without otherwise disturbing them. Here is a twilight zone, in which one group of cases emphasizes the fact that no actual change in possession has taken place, and holds accordingly that no conversion has occurred; while the other group, finding a conversion, lays stress upon the circumstance that, by the levy, the officer, though he may leave physical possession of the property with its owner, nevertheless takes the goods into the custody of the law, thereby assuming constructive possession of them. But beyond this point, in situations involving any lesser "exercise of dominion" than that represented by this paper levy—no attempt having been made to take possession, either actual or constructive, of the plaintiff's property—there is general agreement that there has been no conversion. To more clearly illustrate, we shall refer in detail to two cases whose fact situations somewhat resemble that of the case at bar, but which, without deviating from

authority, have reached opposing results. The reasoning of these decisions seems to us decisive of the present case.

In *St. George v. O'Connell*, 110 Mass. 475, an officer informed the plaintiff that he had attached certain goods which were her property, and forbade her to remove them until the debt, to recover which the writ of attachment was brought, had been paid. In fact, the goods were exempt by law from attachment, and this was known to the attaching officer. He took no possession of the goods, and, in fact, never intended to do so. The whole procedure had been instigated in order to "scare" the plaintiff into paying the bill. In this situation, the plaintiff arranged for satisfaction of the debt; but, subsequently, she brought an action for conversion against both the officer and the individual who had directed the attachment. The judge ruled "that there must be a taking of the goods by the defendants, either actual or constructive, to maintain this action; that it would be a constructive taking if the officer, having a writ of attachment, and being within sight of the goods, informed the owner that he had attached them, and forbade her taking them, unless the debt was paid for the recovery of which the action was brought." Plaintiff recovered, and the quoted ruling was held proper on appeal.

It is apparent that this case was in the twilight zone described above. In holding that there was a conversion, the court was doubtless in accord with the more generally accepted view. Yet, even in this situation, as the foregoing has demonstrated, there was respectable authority available to support an opposite conclusion.

This was not true, however, in the case of *England v. Cowley*, L. R. 8 Exch. 126, where a holding that there had been a conversion would clearly have been unwarranted. There, a tenant had borrowed money from the plaintiff on the security of some household furniture, and upon the failure of the tenant to pay, the plaintiff had lawfully taken possession. But when he sent two men with vans to move the furniture from the house occupied by the tenant, they were met by the landlord, who alleged that half-a-year's

rent was due from the tenant. He stated that he did not propose to allow the goods to be taken away, since he intended on the day following to distrain on them for rent unpaid. To back up his stand, the landlord engaged a policeman whom he stationed outside to prevent the removal of the furniture. The plaintiff thereupon gave up the attempted removal, but left one of his own men still in possession. The landlord did not himself attempt to remove or to take over any of the goods; his object was solely to prevent the plaintiff's removing them in order that he might distrain the next day.

It was alleged that this amounted to a conversion on the part of the landlord; but the court thought otherwise, and exonerated him from liability in trover. Bramwell, B., observed:

"I think no action is maintainable, because the defendant did no act, but only threatened that, in a certain event, he would do something. . . . , the gist of the action [of trover] is the conversion, as for example, by consuming the goods or by refusing the true owner possession, the wrong-doer having himself at the time a physical control over the goods. Now here the defendant did not 'convert' the goods to his own use, either by sale or in any other way. Nor did he deprive the plaintiff of them. All he did was to prevent, or threaten to prevent, the plaintiff from using them in a particular way."

Kelly, C. B., in accord, stated:

"The plaintiff was himself in actual possession of them, and all the defendant did was to say, 'Rent is due to me, and before that rent is paid I will not allow these goods to be removed.' This is no conversion. . . . Indeed, it is only by relying upon the somewhat vague language which has been used about this form of action that any plausible argument can be maintained."

The difference between the *St. George* and *England* cases is apparent. In the former, the attaching officer took no actual possession; but, acting in the name of the law, he attached the plaintiff's goods, taking them into constructive possession and leaving her substantially without rights

with respect to them. In the latter, the landlord did not assume to take any possession, constructive or otherwise. There was no act of interference with the goods, but merely a threat that, if the plaintiff attempted to take them away, such an attempt would be resisted.

Before attempting to relate these cases to the present inquiry, it is necessary to dispose of two preliminary matters. Appellant Sikes argues that he never had any intention of claiming title to the milking machine. However, the criminal complaint, which unequivocally asserted such title, was read to him, and he signed and swore to it; and we are in agreement with the trial court that he cannot now be heard to say that he did not intend it to mean what it plainly said. Secondly, we shall assume that, if a conversion could be found from the facts presented in this case, appellant would be liable therefor, even though, in the criminal complaint, he did not ask that any officer of the law interfere with the property, but only that Martin be arrested for threatening to take and injure it. As respondents point out, there was testimony indicating that Sikes' whole purpose in initiating this procedure was not to get Martin arrested, but, rather, to "scare" him into leaving the property in dispute on the farm.

The resemblance between this situation and that which was before the court in *St. George v. O'Connell, supra,* is obvious; and, while the analogy between a creditor's liability for directing a wrongful levy on the property of a debtor and a complainant's liability for initiating legal process resulting in conversion of property belonging to a defendant may not be in all respects exact, we think the two situations sufficiently parallel to justify holding such a complainant accountable for a conversion arising directly from the steps taken to effectuate his wrongful complaint.

But we need not decide the point. For even if we take the view that the complainant would be liable for any conversion which might have been brought about by the acts of public officers, the question still remains: Was there actually a conversion in this case? Careful study of the

authorities discussed above discloses that the answer must be no. True, Martin's right to control his milking machine was, to a certain extent, interfered with; in a manner of speaking, the deputy sheriff exercised dominion over it, as did Judge Wright when he told him to leave everything "in *status quo.*" But, as *Guarantee Bond & Mtg. Co. v. Hilding* and *England v. Cowley* (not to mention *Hess v. Starwich, Rand v. Sargent, Fernald v. Chase,* and *Bailey v. Adams*) amply demonstrate, the dominion which they exercised was not of the character necessary to constitute a conversion. This case, of course, contains one additional element, not present in the others: the threat of arrest, which the trial court appears to have regarded as decisive of the matter. That, however, effected no change.

"A man may be compelled by threats, or even by physical coercion, to forego the full exercise of his own dominion as owner, yet if the wrongful act falls short of a disseisin of the property, the wrongdoer is not guilty of a conversion." 1 Street, Foundations of Legal Liability, 236.

See, also, 2 Jaggard on Torts 722, § 229; Note, 47 L. Q. Rev. 168.

The determining factor in the situation is that neither the deputy nor anyone else at any time or in any manner took possession, actual or constructive, of the milking machine. There was no "dealing" with the chattel in a manner inconsistent with Martin's rights. *Schlieff v. Bistline*, 52 Idaho 353, 15 P. (2d) 726; Salmond on the Law of Torts, p. 310, § 78. An essential element of the tort of conversion was consequently absent.

A judgment for conversion has normally no other consequence than to compel the defendant to buy the converted goods at what is in reality a forced sale. Prosser on Torts, p. 96, § 15; Harper on Torts, p. 63, § 32; Warren, Trover and Conversion, pp. 3, 29, 30; see *Diamond Ice & Storage Co. v. Klock Produce Co.*, 110 Wash. 683, 189 Pac. 257. The remedy is a drastic one, and writers who have considered it have tended to advise conservatism in its application. Warren, Trover and Conversion, pp. 34-35; Note, 21 Cornell L. Q.

112, reprinted in Fryer, Readings on Personal Property, 291; Note, 8 Harv. L. Rev. 280, reprinted in Fryer, Readings on Personal Property, 289.

We may sympathize with Martin's situation, as the trial court obviously did, for, clearly, he was put to considerable inconvenience as a result of appellant's wrongful conduct. But, speaking solely from the standpoint of fairness and justice, we can see nothing in the factual circumstances of this case which would entitle him to the highly special remedy he seeks. If he is to recover, it can only be because he has shown that, technically, a conversion of his milking machine actually took place. This, however, he has failed to do. It may be conceded that his property was subjected to an unwarranted, and even tortious, intermeddling, although the consequences thereof were scarcely irreparable; but it was not subjected to a conversion as that term has traditionally been understood.

The judgment is reversed, with instructions to the trial court to dismiss the action.

SCHWELLENBACH, C. J., MALLERY, GRADY, and HAMLEY, JJ., concur.

---

May 1, 1951. Petition for rehearing denied.