[No. 17317-4-II. Division Two. May 18, 1995.]

REX B. VALENTINE, *Appellant*, v. THE DEPARTMENT OF LICENSING, *Respondent*.

*Don Peter Taylor* and *Fristoe, Taylor & Schultz,* for appellant.

840

*Christine O. Gregoire, Attorney General,* and *Derek Edwards, Assistant,* for respondent.

HOUGHTON, J. — Rex B. Valentine appeals the suspension of his real estate broker's license for breach of fiduciary duties and conversion. We affirm.

## FACTS

Valentine is a licensed real estate broker for Valentine Realty located in Satsop and Grays Harbor County, Washington.[1] On September 1, 1987, Valentine signed a listing agreement for the sale of property located in Thurston County.

The property was owned by Opal Helland until shortly before her death in 1987. In contemplation of her death, Helland transferred the ownership of the property to her siblings, James Bomboy (Bomboy), John Bomboy, Anna Gehring and Ethel Reeves, as tenants in common, each sharing a one-quarter interest in the property. Shortly after Helland's death, Bomboy initiated the sale of the property, and also the sale of Helland's personal items in a garage sale. He was also responsible for distributing funds from the estate to pay for funeral and burial expenses.

Gehring, however, had concerns about the property and about items she had owned that were in Helland's home. She hired attorney Lawrence Besk, through whom she demanded an accounting of the money received from the garage sale and of disbursements made for funeral and burial expenses. Besk then contacted Bomboy's attorney, Rayburn Dudenbostel, and asked that Dudenbostel keep him informed on the items sold and on the status of the sale of the house.

On September 1, 1987, Dudenbostel hired Valentine on Bomboy's behalf to find a buyer for the house. Bomboy later signed a listing agreement with Valentine, dated September

---

[1]Pursuant to RCW 34.05.514(1), Valentine elected to have the case tried in Thurston County Superior Court.

1, 1987, for the sale of the property. Shortly thereafter, Valentine found John and Pam Keith as potential buyers of the property. On September 5, 1987, Valentine drafted a real estate purchase and sale agreement in which the Keiths agreed to purchase the property for $26,500, tendering $3,000 down with deferred monthly payments on the remainder. The real estate purchase and sale agreement was scheduled for closing on or before September 18, 1987. Valentine and Dudenbostel made arrangements for Pacific Title Company to act as the closing agent.

At the time the sellers approved the purchase and sale agreement, they advised Valentine of their desire to sell the real estate contract for cash. In response to this request, Valentine contacted Wayne Calhoun, a retired banker, who agreed to purchase the contract from the sellers for $18,500 cash. On September 26, 1987, Calhoun deposited the money with appropriate fees in Valentine's trust account. In exchange, he received a seller's assignment of the contract upon closing.

Valentine then told Bomboy and Gehring about Calhoun's offer to buy the real estate contract. While Bomboy approved the assignment, Gehring refused to participate in either the assignment or the sale of the property unless all of the documents were first reviewed by her attorney, Besk. On September 18, all aspects of the real estate sales transaction were complete, except that Gehring refused to sign the agreement releasing her interest in the property. Apparently, Gehring wanted an accounting of the garage sale proceeds before she would sign. When the scheduled date for closing the sale passed, the buyers, who had been allowed to occupy the property, expressed concern over whether the closing would take place. Valentine telephoned Besk and asked him to turn in the papers; however, Besk was out of town.

Besk returned on October 15, 1987. He sent Valentine the closing statement and the seller's assignment of the real estate contract and deed, all of which had been signed by Gehring. Besk's letter to Valentine specified that when he

closed the sale he could not disburse the funds to the sellers until a final accounting of the garage sale proceeds had been made.

At the hearing, Valentine testified, however, that the letter was so ambiguous he could not determine its instructions. Moreover, because of this ambiguity he did not believe he could deliver the documents to the closing agent in order to close the sale, because the escrow agent would ultimately disburse the funds. To determine whether to close the contract, Valentine and his attorney, John Peick, set up a telephone conference call with Besk. Valentine testified that during the call he told Besk he was worried that either the buyers or the assignee would back out of the deal unless the sale was closed immediately. According to Valentine, Besk told him, "[b]y all means, close that sale. We've got to save that deal."

Peick asked Besk to send Valentine a letter with a new set of instructions. Besk compiled a more detailed letter dated October 19, 1987, stating that Valentine was

> authorize[d] to close the sale of the . . . real estate contract. However, all sums are to remain in your trust account and there are to be no dispursements [sic] until the accounting with Mr. Bomboy has been settled.

Valentine testified, however, that he did not believe he could keep the money in his trust account because he believed the funds had to be distributed upon closing.

On October 20, 1987, Valentine delivered all of the funds held in his trust account, including both the Keith earnest money and the Calhoun deposit, to Pacific Title Company. Along with these funds, Valentine also sent a letter to Pacific Title Company employee Jill Beaver, who has 6 years of experience as an escrow agent. The letter stated she was to hold the funds until Besk and Dudenbostal worked out a distribution of the sale proceeds.

Beaver testified that upon receipt of the letter and the funds, she retained the funds in the Pacific Title trust account for 3 days and then disbursed the funds to Dudenbostel. The testimony as to exactly what motivated her to surrender the funds is conflicting. On one hand, Beaver testified that she disbursed the funds because Valentine tele-

phoned and told her to do so. On the day of disbursement, October 23, 1987, Beaver also wrote to Dudenbostel, confirming that she was instructed by "Bomboy et al, to send the proceeds to [Dudenbostel]". Beaver also testified her office was not authorized to prepare the seller's assignment to Calhoun; rather, she held the funds for Valentine only as a courtesy to him. Finally, she testified that she could have closed the purchase and sale agreement even if she had not received the $18,500 from Valentine's trust account for the Calhoun assignment, because the earnest money deposit was sufficient to close the sale.

On the other hand, Dudenbostel testified Beaver told him that she wanted to "get rid" of the $18,500, because her escrow instructions so indicated. Dudenbostel further testified that he did not provide, nor did he believe Bomboy provided, any Pacific Title Company personnel with instructions for disbursement.

After the funds were transferred, Dudenbostel did not inform Besk he had received the funds from the Calhoun assignment until November 17, 1987. On December 15, Dudenbostal disbursed to Gehring her one-quarter share of the $18,500 ($4,193.06).

Following a complaint, the Department of Licensing (the Department) issued a statement of charges against Valentine for alleged violations of RCW 18.85. At a subsequent administrative hearing, an administrative law judge (ALJ) ordered dismissal of the disciplinary action. On review, however, the Director of the Department of Licensing (Director) refused to adopt part of the ALJ's conclusions of law, instead ordering Valentine to pay a $250 fine, and suspending his real estate broker's license for 12 months.

Valentine appealed to the Superior Court, which affirmed the Director's findings of fact and conclusions of law and the order suspending his broker's license. Valentine appeals.

ANALYSIS

1. *Standard of Review.*

■ ■ In reviewing administrative action, we apply the standards of the Administrative Procedure Act (APA) directly to the record before the agency. *Tapper v. Employment Sec.*

*Dep't,*122 Wn.2d 397, 402, 858 P.2d 494 (1993) (citing *Macey v. Department of Empl. Sec.,* 110 Wn.2d 308, 752 P.2d 372 (1988)). Because we review the same record on the same basis as the Superior Court, findings of fact and conclusions of law entered by the Superior Court are superfluous.[2] *Durham v. Department of Empl. Sec.,* 31 Wn. App. 675, 676, 644 P.2d 154 (1982).

■ The APA describes the procedures by which agencies are to conduct internal review of the adjudicative decisions of the lower officials in RCW 34.05.464. Thereunder, agency heads can substitute their own findings for those made by the hearing officers. Therefore, to the extent the ALJ's findings are modified or replaced by those of the Director, it is the Director's findings which are relevant to our review. *See Tapper,* 122 Wn.2d at 406.

■ We will grant relief from an agency order in an adjudicative proceeding only if "[t]he order is not supported by evidence that is substantial when viewed in light of the whole record before the court". RCW 34.05.570(3)(e). Substantial evidence is "evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premises". *Nghiem v. State,* 73 Wn. App. 405, 412, 869 P.2d 1086 (1994) (quoting *Olmstead v. Department of Health,* 61 Wn. App. 888, 893, 812 P.2d 527 (1991)).

■■ On issues of law, we apply the error of law standard of review, permitting us to substitute our judgment for that of the administrative body; however, we accord substantial weight to the agency's view of the law it administers. *Franklin Cy. Sheriff's Office v. Sellers,* 97 Wn.2d 317, 325, 646 P.2d 113 (1982), *cert. denied,* 459 U.S. 1106 (1983). While both Valentine and the Department assert the proper standard of review is de novo for mixed questions of law and fact, we do not review the facts de novo. *Sellers,* 97 Wn.2d at 330.

---

[2]In his brief, Valentine assigns error to the findings of fact and conclusions of law entered by the trial court. However, this court reviews the final decision of an administrative agency action on the administrative record, and not the Superior Court findings and conclusions. *Waste Mgt. of Seattle v. Utilities & Transp. Comm'n,* 123 Wn.2d 621, 633, 869 P.2d 1034 (1994); *see Black Real Estate Co. v. Department of Labor & Indus.,* 70 Wn. App. 482, 486, 854 P.2d 46 (1993).

Rather, when reviewing such questions we determine the law independently, and then apply the law to the facts as found by the agency. *Black Real Estate Co. v. Department of Labor & Indus.*, 70 Wn. App. 482, 487, 854 P.2d 46 (1993).

### 2. *The Director's Findings.*

Valentine contends the Director's finding of fact 14 was not supported by substantial evidence. That finding of fact reads:

> On October 19, 1987, Lawrence R. Besk sent a letter [exhibit 10] to the licensee authorizing him to close the real estate contract, but specifically instructed him not to disburse the proceeds. On October 14, 1987 Lawrence R. Besk sent a letter to the licensee [exhibit 9] along with the real estate transaction documents signed by Anna Gehring. In that letter the licensee was instructed that if he could not honor the condition that no disbursements were to be made until the happening of a condition, that he was to return to Besk the documents with Anna Gehring's signature, and that Anna Gehring's signature would be null and void.

Valentine also assigns error to the Director's failure to adopt the ALJ's finding of fact 14:

> Upon his receipt of the October 14, 1987, letter, the licensee, in a conference call joined by his attorney, John Peick, communicated with Lawrence R. Besk concerning the restrictions placed upon his tender of the documents signed by Anna M. Gehring. Lawrence R. Besk authorized the real estate transaction to close. On October 19, 1987, Lawrence R. Besk directed a letter to the licensee confirming this authorization to close the real estate transaction and to make the payment of a commission. Lawrence R. Besk did not authorize the licensee to release the Calhoun trust deposit to the closing agent.

Our review of the record reveals that sufficient evidence supports the Director's finding. Gehring's attorney Besk instructed Valentine that if he could not close the real estate transaction without disbursing funds to the sellers, then he should return the closing documents to Gehring. Besk's October 14, 1987, letter instructed Valentine not to disburse any funds to the sellers until all parties reached agreement regarding Helland's estate, but to return the closing documents absent such agreement; his October 19, 1987, letter instructed Valentine in detail to close but not disburse; and

Valentine's October 20, 1987, letter to Beaver instructed her to close but hold the sale proceeds, pursuant to Besk's instruction. In addition, the ALJ heard Beaver's testimony that she did not need the $18,500 in order to close the sale. Yet, Valentine still maintains he was uncertain whether to keep the proceeds in his trust account. The Director held this was substantial evidence and we must defer to the Director's decision.

### 3. Breach of Fiduciary Duty.

The Director concluded that Valentine breached his fiduciary duty to his principal by distributing the real estate contract proceeds and documents. While Valentine has assigned error to the Director's conclusion of law, he makes no argument that he did not breach his fiduciary duty.

■■ The Department correctly asserts that the conclusion is actually a finding of fact. Whether a party has breached a duty owed to another is generally a question of fact. See *Grimsrud v. State*, 63 Wn. App. 546, 549, 821 P.2d 513 (1991) (holding where a motorcyclist sought damages from the State for injuries he sustained due to inadequate road warnings, whether the State breached its duty to maintain adequate warnings is a question of fact). A finding of fact incorrectly denominated as a conclusion of law is reviewed as a finding, for substantial evidence. *Prater v. Kent*, 40 Wn. App. 639, 644, 699 P.2d 1248 (1985).

Our review of the record discloses sufficient evidence from which a fair minded person could conclude Valentine breached his duties to his principal, Gehring. Again, evidence was presented that Valentine was instructed by Besk to hold the real estate proceeds in his trust account until accounts from the Helland estate were settled and that it was not necessary to surrender the proceeds to escrow to close the contract. Moreover, some evidence showed that Valentine failed to honor these instructions, instead disbursing the funds to Pacific Title. Although Valentine offered contrary evidence suggesting that his instructions were to disburse the funds and close the contract, the Director, taking all of the evidence into consideration, nonetheless found

Valentine erroneously surrendered the funds and violated his fiduciary duties. Applying the deferential substantial evidence review standard, we are constrained to uphold the Director's findings of fact and conclusions of law.

### 4. Conversion.

Finally, Valentine asserts that the Director erred in concluding that Valentine converted the real estate contract and sale proceeds in violation of RCW 18.85.230(7). The Director concluded:

> The licensee did convert money, contract or deed to his use or the use of his principal by delivering the purchase and sale agreement and the proceeds of the real estate contract to the escrow agent for closing, prior to the happening of a condition.

A director may suspend or revoke the license of a real estate broker who is guilty of:

> Conversion of any money, contract, deed, note, mortgage, or abstract or other evidence of title, to his or her own use or to the use of his or her principal or of any other person, when delivered to him or her in trust or on condition, in violation of the trust or before the happening of the condition; and failure to return any money or contract, deed, note, mortgage, abstract or other evidence of title within thirty days after the owner thereof is entitled thereto, and makes demand therefor, shall be prima facie evidence of such conversion[.]

RCW 18.85.230(7).

■ ■ We neither find, nor are we directed to, any opinion interpreting the above language. Nor do the relevant portions of the Washington Administrative Code, WAC 308-124, discuss the meaning of this statute. Our purpose here, therefore, is to effectuate the Legislature's intent. *State v. Kuhn*, 74 Wn. App. 787, 790, 875 P.2d 1225 (1994). We give terms undefined in the statute their plain and ordinary meaning, unless we find contrary legislative intent. *State v. Sunich*, 76 Wn. App. 202, 207, 884 P.2d 1 (1994); *see also In re Discipline of Blauvelt*, 115 Wn.2d 735, 741, 801 P.2d 235 (1990) (using dictionary definition for undefined term).

■ By its plain terms, the statute allows suspension of Valentine's real estate license if he converted Gehring's executed assignment of her real estate contract and deed to the use of his principal, Bomboy, prior to meeting the condition she placed, that is, disposition of the garage sale proceeds. Conversion, which is not defined in the statute, means to "change from one . . . party . . . to another"; "an appropriation of and dealing with the property of another as if it were one's own without right". *Webster's Third New International Dictionary* 499 (1976);[3] *see also* Black's Law Dictionary 300 (5th ed. 1979) ("Any unauthorized act which deprives an owner of . . . property permanently or for an indefinite time").[4] The statute specifies that Valentine had no "right" to disburse the proceeds of the sale until Gehring's conditions had been met. We have already noted that substantial evidence supports the Director's finding that Valentine's disbursement was unauthorized. This unauthorized disbursement deprived Gehring of her interest in and right to her property, in favor of Valentine's principal, Bomboy, and constitutes a conversion under the terms of this statute.

Affirmed.

SEINFELD, C.J., and FLEISHER, J., concur.

Review denied at 127 Wn.2d 1020 (1995).

■

---

[3]This dictionary definition is consistent with the common law definition of conversion adopted in Washington subsequent to the enactment of the conversion paragraph at Laws of 1941, ch. 252, § 19(g). "A conversion is the act of wilfully interfering with any chattel, without lawful justification, whereby any person entitled thereto is deprived of the possession of it." *Martin v. Sikes* 38 Wn.2d 274, 278, 229 P.2d 546 (1951) (quoting Salmond on the Law of Torts 310 § 78, at 310 (9th Ed. 1936)); *See In re Brazier Forest Prod. Inc.*, 106 Wn.2d 588, 595, 724 P.2d 970 (1986) (applying common law definition to undefined term).

[4]*See National Fed. of Retired Persons v. Insurance Comm'r*, 120 Wn.2d 101, 112, 838 P.2d 680 (1992) (employing legal dictionary to define statutory term).