[No. 39178-0-I.    Division One.    August 25, 1997.]

CARRIE L. GALVIN, *Respondent*, v. THE EMPLOYMENT SECURITY DEPARTMENT, *Appellant*.

*Christine O. Gregoire, Attorney General,* and *Gwendolyn Howard, Assistant,* for appellant.

*William B. Knowles* and *Matthew J. Bean,* for respondent.

ELLINGTON, J. — Carrie Galvin had chronic attendance problems while an employee of the Seattle Department of Parks and Recreation. She received repeated warnings, and was eventually terminated. The issue before us is whether she was terminated for misconduct such as would justify denial of unemployment benefits.

The Commissioner of the Employment Security Department (ESD) denied unemployment benefits on the ground that Galvin was discharged for misconduct connected with her work. The superior court reversed. We agree with the superior court to the extent it found that absences due to Galvin's documented illness are not proper grounds for a denial of benefits. When Galvin took vacation without obtaining advance approval, however, in direct violation of both her employer's vacation policy and an explicit condition of her own continued employment, she committed misconduct connected with her work. We therefore reverse the superior court and reinstate the Commissioner's denial of benefits.

## FACTS

Carrie Galvin was employed by the Seattle Department of Parks and Recreation as a full-time general laborer from February, 1989 until her termination on March 11, 1995. For a considerable period before her dismissal, she

was chronically absent from work. During the year preceding her dismissal, she was repeatedly notified that improved attendance was required.

On March 22, 1994, Galvin was notified by Bobbi Wallace, a Parks Resources Manager, that she was required to attend a fact-finding hearing "to discuss the matter of your attendance, past sick leave usage and your low sick leave balance." On April 25, 1994, Galvin was notified that she was required to attend another fact-finding hearing "to discuss the matter of your attendance, pattern of sick leave usage, your low sick leave balance, your ability to work on a regular basis, and not calling your supervisor to report that you will not be at work."

Yet another fact-finding in May, 1994, resulted in an understanding that Galvin was to call her supervisor within an hour of her work shift if she was ill or had an emergency that prevented her from coming to work. The memorandum also informed Galvin that she was required to "significantly improve" her attendance, demonstrate her ability to work on a regular basis, and arrange for participation in the Employee Assistance Program (EAP). The EAP is a program offered by the City to help its employees deal with problems and issues through counseling sessions.

Following still another fact-finding hearing in November, 1994, North Division Director Margaret Anthony outlined in a memorandum the improvements and procedures Galvin was required to follow in order to continue her employment with the Parks Department: an immediate improvement in attendance, a demonstrated sustained ability to work on a regular basis, a cessation of use of vacation or compensatory time to cover illnesses unless medical documentation is provided, 48-hour advance scheduling of all requests for vacation and compensatory time, submission of medical documentation for all absences due to illness, and continued participation in the EAP and a follow-up in whatever program was recommended.

A presuspension hearing was held on November 28,

1994, after which the Superintendent of the Parks Department suspended Galvin from work without pay for three days because of: "Intentional violation of a regulation, order, or direction given by one's supervisor in the absence of exonerating circumstances; . . . uncorrected inefficiency in the performance of the duties of employment, and [m]isuse of sick leave." The suspension notice states: "Further violations could result in your demotion or dismissal." In a memorandum dated December 7, 1994, the Superintendent reiterated the requirements of Galvin's continued employment as set forth in Director Anthony's memorandum, and established monthly reviews, which were conducted in person by Wallace.

Galvin had not been at work for a full 80-hour pay period during all of 1994. As of November 2, 1994, she had missed a total of 544 hours of work for the year, 267 of which were without pay because she had exhausted her sick leave. During the pay period ending November 15, 1994, Galvin took an additional nine hours of unpaid sick leave. The record does not indicate major medical problems. Rather, Galvin's sick leave was variously occasioned by her own routine illnesses (flu, colds), the typical childhood maladies of her preschooler, and two orthopedic injuries suffered by her husband for which outpatient surgery was scheduled.

By February, 1995, Galvin had dropped out of the EAP. The program director stated that she had been nonresponsive and recommended further counseling. She continued to be frequently absent because of illness. On February 17, she took vacation without advance approval.

Resources Manager Wallace sent a memorandum to Director Anthony stating that since December, 1994, Galvin had yet to work a full pay period, and that Galvin's attendance had shown no improvement.

On March 7, 1995, Anthony notified Galvin that she had failed to improve her attendance, show a sustained ability to work on a regular basis, schedule vacation time in advance, or fully comply with the requirements of her

EAP treatment program, and that a hearing would be held the following day. The memorandum concludes by notifying Galvin that Anthony was recommending her dismissal from the Parks Department.

A hearing was held, and by letter dated March 13, 1995, the Superintendent dismissed Galvin effective March 11, 1995. The letter sets forth the reasons for the dismissal and concludes:

> You have not complied with the requirements set forth in my December 7, 1994, letter. Your sick leave use already exceeds the City wide average [for six months], your request for vacation on February 17 was not made in advance, and you made frequent requests for vacation while you were expected to improve your regular attendance, and most significantly, you failed to follow the treatment program recommended as a result of your mandatory Employee Assistance Program referral. Each of these violations standing alone demonstrate [sic] your unwillingness to improve and meet our workplace requirements. These continued infractions warrant your dismissal which is effective March 11, 1995.

The Employment Security Department (ESD) denied Galvin's request for unemployment benefits on the ground that she had been discharged for misconduct—specifically, conduct in violation of a reasonable rule connected with her employment. On Galvin's appeal, an administrative law judge (ALJ) reversed the denial of benefits, concluding that her absences were beyond her control and that the failure to attend additional EAP sessions was not misconduct. The administrative law judge did not make any finding relevant to Galvin's unapproved absence on February 17.

On the City's petition for review, the Commissioner of ESD again reversed, concluding that Galvin was discharged for misconduct in connection with her work. The Commissioner noted that Galvin was warned repeatedly of the need to attend work on a regular basis, was disciplined with suspension prior to being discharged, failed to provide medical documentation for her sick leave, failed to obtain her supervisor's approval prior to taking

leave time, and failed to utilize the day care provided by the City for mildly sick children of its employees. The Commissioner found that this conduct was in willful disregard of the employer's interest and that Galvin's irregular attendance harmed her employer's business.

On Galvin's petition for review, the superior court reversed the Commissioner's decision and reinstated the ALJ's decision. The court found that Galvin, her husband, and her son had genuine health problems that necessitated Galvin's absences. The court acknowledged that Galvin might have used leave without pay or cut corners in her requests for vacation time, but determined that such conduct did not constitute misconduct. The court denied ESD's motion for reconsideration and ESD appeals.

## DISCUSSION

### Standard of Review

■ "Judicial review of a decision of the commissioner involving the review of an appeals tribunal decision may be had only in accordance with the procedural requirements of RCW 34.05.570." RCW 50.32.120. In reviewing an administrative decision, the appellate court stands in the same position as the superior court. *Penick v. Employment Sec. Dep't*, 82 Wn. App. 30, 37, 917 P.2d 136, *review denied*, 130 Wn.2d 1004 (1996). Thus, the appellate court applies the appropriate standard of review directly to the administrative record. *Snohomish County v. State*, 69 Wn. App. 655, 664, 850 P.2d 546 (1993), *review denied*, 123 Wn.2d 1003 (1994).

■ Relief from an agency order in adjudicative proceedings will be granted if the agency has erroneously interpreted or applied the law, RCW 34.05.570(3)(d), or the order is not supported by substantial evidence, RCW 34.05.570(3)(e), or the order is arbitrary and capricious, RCW 34.05.570(3)(i). Factual findings are reviewed under the substantial evidence standard, under which there must be sufficient evidence in the record to persuade a reason-

able person that the declared premise is true. *Penick*, 82 Wn. App. at 37. Conclusions of law are reviewed under the error of law standard. *Penick*, 82 Wn. App. at 37. Great deference is given to the Commissioner's factual findings and substantial weight is given to the agency's interpretation of the law. *Penick*, 82 Wn. App. at 37-38.

■ The determination of whether an employee's behavior constitutes misconduct is a mixed question of law and fact. *Tapper v. Employment Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993). In resolving this question, the court gives the agency's factual findings the same deference to which they are entitled under any other circumstance, but the process of applying the law to the facts is a question of law and is subject to de novo review. *Tapper*, 122 Wn.2d at 403.

### Definition of Misconduct

■ Under the Employment Security Act, an individual is disqualified from benefits if he or she was discharged "for misconduct connected with his or her work." RCW 50.20.060. Until 1993, misconduct was not statutorily defined. In 1993, the Legislature enacted RCW 50.04.293, defining misconduct as "an employee's act or failure to act in willful disregard of his or her employer's interest where the effect of the employee's act or failure to act is to harm the employer's business." Proper interpretation of this definition is our concern here, as it was in *Wilson v. Employment Sec. Dep't*, 87 Wn. App. 197, 940 P.2d 269 (1997). Discerning the legislative intent requires review of previous judicial definitions.

Until 1988, the prevailing definition was that set forth in *Boynton Cab Co. v. Neubeck*, 237 Wis. 249, 296 N.W. 636 (1941), which we quoted in *Shaw v. Department of Employment Sec.*, 46 Wn. App. 610, 731 P.2d 1121 (1987) as follows:

"[T]he intended meaning of the term 'misconduct,' . . . is limited to conduct evincing such wilful or wanton disregard

of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interest or of the employee's duties and obligations to his employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good-faith errors in judgment or discretion are not to be deemed 'misconduct' within the meaning of the statute."

*Shaw*, 46 Wn. App. at 613-14 (quoting *Boynton Cab*, 296 N.W. at 640).

Then in 1988, in *Macey v. Department of Employment Sec.*, 110 Wn.2d 308, 752 P.2d 372 (1988), the Supreme Court rejected the *Boynton Cab* definition of misconduct as "patently confusing." *Macey*, 110 Wn.2d at 317. The *Macey* court particularly found fault with *Boynton Cab*'s emphasis on the employer's interest, as opposed to the effect of the employee's conduct upon his or her work performance and upon the work force. *Macey*, 110 Wn.2d at 318-19. The *Macey* court held that the following general criteria established disqualifying, on-the-job, misconduct: "(1) The rule must be reasonable under the circumstances of the employment; (2) the conduct of the employee must be connected with the work . . .; and (3) the conduct of the employee must in fact violate the rule." *Macey*, 110 Wn.2d at 319.

Reacting to the *Macey* decision, the Legislature enacted the present definition in 1993. The final bill report noted that "[a] recent Supreme Court definition is quite broad and does not require intent or harm to the employer's business." E.S.S.B. 5702, 1993 FINAL LEGISLATIVE REPORT,

53RD WASH. STATE LEGISLATURE, at 288.[1] The enacted definition is consistent with the language and concepts of *Boynton Cab*, and reinstates harm to the employer as an element of misconduct: "willful disregard of his or her employer's interest where the effect . . . is to harm the employer's business." RCW 50.04.293.

■ *Tapper* was decided after the effective date of RCW 50.04.293, but the new statute did not apply to the employment actions challenged there, and the court specifically did not consider "what effect, if any, the new legislation would have on our existing misconduct jurisprudence." *Tapper*, 122 Wn.2d at 408 n.7. Nonetheless, based on its reading of *Macey*, the Supreme Court in *Tapper* returned to a definition of misconduct reminiscent of *Boynton Cab*. Specifically, the court enunciated a fourth element to the *Macey* test: not only must there be violation of a reasonable, work-related rule, but the conduct must be "intentional, grossly negligent, or continue to take place after notice or warnings." *Tapper*, 122 Wn. 2d at 409. The *Tapper* court found this fourth element inherent in the *Macey* court's analysis, although not enumerated in the three elements of the test set forth there, and noted that the operative principle for denial of benefits is fault: "An employee is only guilty of misconduct when his or her behavior is such that the 'unemployment is in effect voluntary'." *Tapper*, 122 Wn.2d at 409 (quoting *Macey*, 110 Wn.2d at 316).

The purpose of the fourth part of the test, then, is to preserve eligibility for benefits where the employee merely makes an error in judgment, or is incapable of performing his or her duties: "That is, the behavior [constituting misconduct] cannot be characterized as mere incompetence, inefficiency, erroneous judgment, or ordinary negligence." *Tapper*, 122 Wn.2d at 409. We conclude that the four elements of the *Tapper* misconduct test fairly

---

[1]It is clear from the House Bill Report that the Legislature was referring to the decision in *Macey*. *See* H.B. Rep., E.S.S.B. 5702, 53rd Legis. Sess. at 2 (1993).

interpret the Legislature's intent in defining "misconduct." We so held in *Wilson*, 87 Wn. App. at 201-02.

## Galvin's Conduct

Application of RCW 50.04.293 and our interpretation of it in *Wilson* to the facts of the present case require that we separate the absences for which Galvin was discharged into three groups: absences due to her own illness, absences due to illness or injury of family members, and her absence on February 17, 1995.

■ We find that Galvin's absences due to her own illness did not constitute misconduct. Contrary to the Commissioner's implicit finding,[2] Galvin provided medical documentation for these absences, and we find nothing in the record to suggest that she was not legitimately ill on these occasions or that she did not properly notify her employer. Galvin's illnesses were beyond her control, and cannot form the basis for the conclusion that she acted in willful disregard of her employer's interest.

Galvin's absences due to her child's illness and her husband's injury raise competing concerns. On the one hand, at the time she missed work for these reasons, Galvin had been clearly apprised of the need to improve her attendance at work. Notwithstanding these warnings, Galvin failed to use reasonably available alternatives, such as the day care services provided by the City for mildly ill children of its employees, or alternative arrangements for her husband's transportation to the doctor. On the other hand, Galvin provided medical documentation for her child's illnesses, was not required to utilize the day care services,[3] and had obtained prior approval for the vacation time to care for her husband. Under the circum-

---

[2]As was the case in *Tapper*, we are faced on appeal with the absence of clearly defined findings from the Commissioner. *See Tapper*, 122 Wn.2d at 406. We have reviewed the decisions below to discern the relevant findings.

[3]Employee participation in the day care program was voluntary, not mandatory.

stances presented here, treating these absences as misconduct could implicate state and federal family leave acts.[4] These issues deserve more extensive briefing than has been provided here. Because we find, on the basis of Galvin's absence on February 17, that she was discharged for misconduct, we do not decide whether Galvin's absences due to her child's illness or her husband's injury could form the basis for a denial of benefits under RCW 50.20.060.

As to the February 17 incident, the surrounding circumstances are not precisely clear from the record. According to one of ESD's memoranda, Galvin took three hours of unauthorized leave on that date. According to the letter terminating Galvin, she left a note on her immediate supervisor's chair on February 17 stating that she wanted to leave work early to take care of some last-minute business, and then left work without ascertaining whether her request had been approved. Her supervisor did not find the note until February 21. According to Galvin, she left a note for her supervisor on Thursday, February 16, stating that she wanted to take off Friday, February 17. Her supervisor left before her on Thursday and told her to "have a good weekend," which Galvin interpreted as an approval of her request to take Friday off.

■ Regardless of these ambiguities, it is undisputed that Galvin took vacation time on February 17 without obtaining approval 48 hours in advance, which was one of the specific requirements of Galvin's continued employment set forth in the December 7, 1994 memorandum to Galvin from the Superintendent of the Parks Department. There is nothing in the record indicating the "last-minute business" was an emergency. Galvin thus deliberately disregarded a specific directive from the highest official in her department, a directive communicated repeatedly, clearly, personally, and with some force.

Galvin does not argue that the 48-hour advance ap-

[4]RCW 49.78; 29 USCA § 2601.

proval requirement was unreasonable. Instead, she argues that her failure to obtain proper advance approval cannot be misconduct because the day before she left work, her immediate supervisor told her work crew that, in his opinion, it was not necessary to comply with the Parks Department's 48-hour advance approval requirement. According to Galvin, her supervisor told members of the work crew that he "didn't care if [the crew members] left two-minute's notice."[5]

Under the circumstances here, it was not reasonable for Galvin to rely on her understanding of her immediate supervisor's general view of the vacation approval policy. Several officials of the Parks Department, all occupying positions superior to Galvin's work crew supervisor, had clearly and unequivocally communicated the requirement that *she* schedule *her* vacations in advance as a condition of her continued employment. This and other requirements were reiterated to Galvin on a monthly basis during one-on-one reviews, and also in numerous memoranda sent directly to Galvin. At no time did any of these managers give Galvin any reason to believe she could ignore these conditions.

Unlike her absences due to illness, this absence was entirely within Galvin's control. Her conduct was in direct violation of a reasonable rule connected with her work, was intentional, and took place after numerous warnings. Galvin's extraordinary absence record clearly affected her employer's interests. Her disregard of the approval requirement demonstrates indifference to her employer's legitimate objective of a predictable work force complement. This is willful disregard of the employer's interest and constituted misconduct as that term is defined in RCW

[5]The supervisor did not testify.

2

50.04.293, thus justifying a denial of benefits under RCW 50.20.060.[6]

The decision of the trial court granting benefits is reversed, the Commissioner's decision denying Galvin unemployment benefits is reinstated, and Galvin's request for attorney fees is accordingly denied.

GROSSE and AGID, JJ., concur.

Review denied at 134 Wn.2d 1004 (1998).

---

[6]Because we find that benefits were properly denied on the basis of Galvin's conduct in connection with the February 17 incident, we do not address her failure to continue in the Employee Assistance Program.