[No. 39906-3-I. Division One. December 15, 1997.]

KATHLEEN E. DERMOND, *Appellant*, v. THE EMPLOYMENT SECURITY DEPARTMENT, *Respondent*.

---

[17]RAP 18.1(d).

John C. Peick of *Peick, Lingenbrink & Magladry, P.S.*, for appellant.

*Christine O. Gregoire, Attorney General*, and *Sara J. Mac-Duff, Assistant*, for respondent.

ELLINGTON, J. — In recent decisions we have interpreted the legislative definition of "misconduct" for which a terminated employee will be denied unemployment benefits.[1] This case involves yet another aspect of the definition. Disqualifying misconduct occurs *"where the effect of the employee's act or failure to act is to harm the employer's business."* RCW 50.04.293 (emphasis added). We hold that proof of tangible economic harm is not a prerequisite to denial of benefits, but actual detriment to the employer's operations must be demonstrated.

## Facts

Kathleen Dermond worked as a telecommunications analyst at Airborne Express and was responsible for Airborne's Cincinnati district. In May 1995, she had a confrontation with her supervisor, Kerry Ivers. She left work early and then worked at home for two days without permission. Ivers told her that her behavior was grounds for termination. He did not terminate her, however. He gave her a list of department performance expectations, which required her to notify him of critical problems such as "downed systems" as they occurred and to advise him of the status of ongoing problems before leaving for the day. He told Dermond that any deviation from those requirements would mean immediate dismissal. The list of performance expectations was given to all department employees.

In October, the voice communications system in Cincinnati shut down. Despite the requirements of the performance expectations, Dermond did not notify Ivers of the shutdown. She made efforts to reroute the communications traffic, and then left for the day without advising Ivers of the situation and without advising co-workers how to finish restoring the system. Ivers learned of the shutdown when another employee asked him how to handle it.

The next day Ivers met with Dermond to discuss various

---

[1]*See Galvin v. Employment Sec. Dep't*, 87 Wn. App. 634, 942 P.2d 1040 (1997); *Wilson v. Employment Sec. Dep't*, 87 Wn. App. 197, 940 P.2d 269 (1997).

performance issues, including her failure to inform him of the downed system. Ivers did not intend to terminate Dermond at the meeting. But when Ivers asked Dermond about her failure to report the shutdown, she said that because the problem involved her territory, it was no one's business but hers and she did not think reporting it was necessary. When Ivers reminded her of the department performance expectations, Dermond told Ivers that there was no point in further discussion. After she repeated her refusal to discuss the issue three times, Ivers fired her. He testified that Dermond was terminated both because she did not follow the performance expectations and because she refused to discuss her performance or the company's expectations.

The Employment Security Department (ESD) initially determined that Dermond was eligible for benefits because no misconduct occurred. Airborne appealed. The administrative law judge set aside the benefit award, ruling that Dermond engaged in disqualifying misconduct because she refused to comply with the requirement to keep Ivers informed, she refused to discuss her conduct with Ivers, and no sufficient mitigating circumstances excused her willful misconduct.[2] The administrative law judge concluded that harm to an employer could be either tangible or intangible, that the harm here was intangible,[3] and that "an intentional act resulting in violation of an employer rule results in *per se* harm."

Dermond appealed. The ESD commissioner affirmed the

---

[2]The administrative law judge considered Dermond's alleged prior problems with Ivers when deciding whether mitigating factors excused her misconduct. Dermond claimed that Ivers was hostile toward her because she had refused to go out with him before she began working for Airborne. She admitted, however, that she had a friendly relationship with him for the first year that he was her supervisor, but claimed that he quit talking to her after she refused to discuss his personal life. She reported the lack of communication to Airborne and filed negative performance reviews on Ivers, but she never filed a formal grievance. The administrative law judge ruled that these allegations were not sufficiently mitigating to excuse her misconduct.

[3]The administrative law judge determined that "[t]he harm is found in the actual breach of the employer's rule[,] which is evidence of a breakdown of discipline, and a lack of respect for those rules established to keep order in the work place."

administrative law judge's decision. Dermond appealed to superior court, arguing that disqualification for misconduct cannot be based upon intangible harm. The superior court affirmed, and Dermond appealed to this court.

## Standard of Review; Procedure

■ In an appeal from an ESD decision, we apply the appropriate standards of review from RCW 34.05.570 directly to the agency record. *Galvin v. Employment Sec. Dep't*, 87 Wn. App. 634, 640, 942 P.2d 1040 (1997); *Wilson v. Employment Sec. Dep't*, 87 Wn. App. 197, 200, 940 P.2d 269 (1997). Relief from such decisions will be granted when an agency erroneously interpreted or applied the law or the decision is not supported by substantial evidence. RCW 34.05.570(3). The burden of proving that the agency action was invalid for any of these reasons lies with Dermond, as the party challenging the action. RCW 50.32.150; RCW 34.05.570(1)(a).

■ Whether Dermond's behavior was misconduct presents a mixed question of law and fact. In addressing the factual aspects of this challenge, we give the same deference to the agency's factual findings as in other circumstances. In addressing the legal aspects of this challenge, however, we apply the law to the facts de novo. *Galvin*, 87 Wn. App. at 641 (citing *Tapper v. Employment Sec. Dep't*, 122 Wn.2d 397, 402-03, 858 P.2d 494 (1993)).

Dermond challenges certain findings of the administrative law judge as not supported by the evidence. We find no merit in these challenges.[4] The issue here is whether Dermond's conduct was disqualifying misconduct under the statute.

## Misconduct

Under the Employment Security Act, an individual discharged

---

[4]Dermond challenged the findings that she failed to report the downed system, that she left work before Ivers was notified of the downed system, that she told him she did not think she had to report the downed system, and that she refused to discuss the performance expectations with him. These findings are amply supported by testimony from both Dermond and Ivers.

for misconduct is disqualified from receiving benefits. RCW 50.20.060. Misconduct is defined as "an employee's act or failure to act in willful disregard of his or her employer's interest where the effect of the employee's act or failure to act is to harm the employer's business." RCW 50.04.293.

 In deciding whether an employee's conduct is disqualifying misconduct under the statute, we examine whether the employee's violation of the employer's rule is " 'intentional, grossly negligent, or continue[s] to take place after notice or warnings.' " *Wilson*, 87 Wn. App. at 202 (quoting *Tapper*, 122 Wn.2d at 409). Mere incompetence, inefficiency, erroneous judgment, or ordinary negligence does not constitute misconduct for purposes of denying unemployment compensation. *Wilson*, 87 Wn. App. at 202; *see also Galvin*, 87 Wn. App. at 643.

Dermond violated Airborne's rules requiring her to notify her supervisor of critical problems, and to advise him of their status at the end of the day. Her violations were intentional and came after warning that termination would occur. Such conduct is not, as Dermond urges, a mere error in judgment. The rules are patently reasonable, given the need for coordinating responses, monitoring impact on other systems, and adjusting for the resulting delays. Dermond's failure to notify Ivers is therefore disqualifying misconduct if it had the effect of harming Airborne's business.

## Harm to Employer's Business

We reviewed the history of the misconduct definition in *Galvin*, noting that the Legislature's intent in enacting RCW 50.04.293 was to ensure that a denial of benefits follows only from conduct both willful ("willful disregard of [the] employer's interest") and harmful to the employer ("effect . . . is to harm the employer's business"). *Galvin*, 87 Wn. App. at 641-43. The question presented here is what harm to the employer's business must be demonstrated.

No previous cases have directly discussed the proper interpretation of this requirement. But before the Legislature explicitly required a showing of such harm, our case law required that the employee's conduct "resulted in some harm to the employer's interest." *Nelson v. Employment Sec. Dep't*, 98 Wn.2d 370, 374-75, 655 P.2d 242 (1982). An employee's failure to comply with an employer's reasonable rule has been held disqualifying misconduct under this test. *See Peterson v. Employment Sec. Dep't*, 42 Wn. App. 364, 370-71, 711 P.2d 1071 (1985) (holding that disqualifying misconduct occurred when employee refused to answer supervisor's questions about why employee violated policy by leaving job without permission), *review denied*, 105 Wn.2d 1011 (1986). We discern no meaningful difference between the *Nelson* requirement and that of the new statute.

Indeed, as we noted in *Galvin*, the Legislature adopted RCW 50.04.293 to reject the less rigorous definition of misconduct announced by the Supreme Court in *Macey v. Employment Sec. Dep't*, 110 Wn.2d 308, 752 P.2d 372 (1988). The *Macey* test departed from earlier case law, requiring only that an employee violate a reasonable rule connected to the work. *Macey*, 110 Wn.2d at 319. The Legislature's rejection of the *Macey* test is apparent from the note in its final bill report enacting RCW 50.04.293, stating that " '[a] recent Supreme Court definition is quite broad and does not require intent or harm to the employer's business.' " *See Galvin*, 87 Wn. App. at 642-43 (quoting E.S.S.B. 5702, 1993 FINAL LEGISLATIVE REPORT, 53RD WASH. STATE LEGISLATURE, at 288). The Legislature's definition reinstated the "harm to employer" requirement of pre-*Macey* case law. Thus, pre-*Macey* cases are helpful in discerning the legislative intent at issue here regarding the harm that must be demonstrated.

*Peterson* is instructive because the harm described there was neither tangible nor economic. *See Peterson*, 42 Wn. App. at 370-71 (harm from refusal to answer questions about leaving work in violation of rules). Dermond never-

theless advocates a rule that an employer must demonstrate tangible economic harm. We reject this proposition.

First, it is unlikely the Legislature intended that the phrase "employer's business" be construed to include only commercial enterprises. Business is defined as a "purposeful activity," "role," "function," "task," "serious activity." *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 302 (1976). One synonym for business is "work." *Id.*

The Legislature is certainly aware that many employers covered by the Employment Security Act are not engaged in commerce and would have great difficulty demonstrating an actual financial loss. A volunteer coordinator employed by a nonprofit agency who refused to work might cause grave harm to those not served, but no tangible economic harm to the employer. A church employee who defiantly locked worshippers out of the church would cause consternation and inconvenience, but not necessarily tangible economic harm to the church. And except in cases of actual property damage, government or other public employers would rarely be able to make a showing of tangible economic harm. It is apparent from the definition of business that the Legislature intended to require a showing of harm to the endeavor for which the employer has organized its work force.

Second, we reject the tangible economic harm argument because it penalizes an employer who takes appropriate mitigating steps to prevent tangible harm that might otherwise result. The employer who becomes aware of potentially harmful conduct by an employee should not be required to wait until financial loss is realized before acting to terminate the miscreant.

While the harm suffered need not be tangible or economic, we believe the Legislature intended that it be more than imaginary or theoretical. We do not adopt the reasoning of the administrative law judge that intentional violation of an employer's rule results in per se harm, as we believe this paints with too broad a brush. We hold that to establish that an employee's conduct had the effect of caus-

ing harm to the employer's business, actual detriment to the employer's operations must be objectively demonstrated. Each case must be examined on its own facts.

Dermond's conduct satisfies this test. She directly violated a clear and reasonable policy central to her employer's operations. Dermond's refusal to notify Ivers led to confusion, the possibility of increased delays, the possibility of overloading other systems carrying temporarily rerouted traffic, and prevented Ivers from taking steps to monitor and coordinate the overall situation. Dermond's direct refusal to discuss her violation amounted to an implicit declaration that she had no intent to comply in the future, which itself harmed her employer's operations by creating uncertainty about the conduct of an employee handling "critical problems." We hold that her conduct had the effect of causing harm to the employer's business within the meaning of RCW 50.04.293.

The administrative law judge did not err in concluding that Airborne was harmed, and the trial court correctly affirmed the administrative law judge's denial of benefits.

Affirmed.

BAKER, C.J., and GROSSE, J., concur.