[No. 43805-1-I.   Division One.   May 22, 2000.]

ALBERTSON'S, INC., *Appellant*, v. THE EMPLOYMENT SECURITY DEPARTMENT, ET AL., *Respondents*.

*Patrick M. Madden* and *Stephanie W. Pickett* (of *Preston Gates & Ellis*), for appellant.

*Christine O. Gregoire*, *Attorney General*, and *Gwendolyn Howard*, *Assistant*; and *Howard K. Todd*, for respondents.

ELLINGTON, J. — Debbie Griswold was fired from her job as a meat wrapper at Albertson's, Inc. because she purchased outdated meat at a marked down price. When Griswold applied for unemployment compensation benefits under the Employment Security Act, Albertson's contested her

eligibility, arguing she was terminated for disqualifying misconduct. The commissioner disagreed, but denied benefits on the ground that Griswold's search for work outside the grocery business was such that she was not "available for work."

We hold that Griswold's purchase of the meat did not constitute disqualifying misconduct because Albertson's written policies suggested such purchases were appropriate with proper authorization, and the purchase of past-pull-date meat by employees was routinely authorized and encouraged by Griswold's immediate supervisor. Her conduct was thus not in willful disregard of her employer's interest. We further hold that Griswold was available for work because she was seeking suitable work and had placed no restrictions on her search that seriously affected her chances of becoming employed. Accordingly, we affirm the commissioner's decision as to misconduct, reverse the decision as to Griswold's availability for work, and reinstate Griswold's unemployment benefits.

## FACTS

Debbie Griswold worked for Albertson's for five years as a meat wrapper. After she purchased past-pull-date meat at a marked down price, Albertson's terminated her. Griswold applied for unemployment benefits and the Employment Security Department (ESD) awarded benefits. Albertson's appealed, alleging Griswold violated company policy against unauthorized possession of merchandise and thereby committed willful misconduct.

The administrative law judge (ALJ) found that the purchase of meat made openly by Griswold on March 28, 1997 was common practice ("meat had been purchased in this manner many times before by the claimant and other employees in the store"), and that no objection had previously been lodged against the practice. The ALJ further found as follows:

4. As a meat department worker, the claimant took direction from the meat department managers. Throughout her period of employment, she had been instructed by various meat department managers including Mr. Les Varga, the meat department manager until February 1997, to price meat for substantially reduced amounts for sale to Albertson's employees only. The claimant and others purchased the deeply discounted meat on a routine basis. Mr. Varga was replaced by Mr. Fred Lamuth.

5. The interested employer policy prohibits the purchase of past pull-date meat at discounts by employees. However, meat department managers allowed such purchases to increase their monthly sales total. The claimant had received no prior warnings for violations of this policy. At the time she purchased the deeply discounted meat in March 1997, she believed she was following the established practice which allowed such purchases. Following the claimant's discharge, Albertson's specifically instructed meat market managers to discontinue this practice.

6. The testimony of the parties conflicted on material points. The undersigned, having carefully considered and weighed all the evidence, including the demeanor and motivation of the parties, the reasonableness of the testimony, and the totality of the circumstances presented resolves conflicting testimony in favor of the claimant. The testimony of Mr. Fred Lamuth was not credible.

7. During the weeks at issue, the claimant was able to, available for and actively seeking work. She refrained from seeking work in the grocery industry due to the events which had resulted in her job separation. Griswold has worked in bookkeeping and accounting and has sought work in this field. She contacted approximately three employers per week by resume. She received no specific direction from the Department with regard to her job search.

The ALJ concluded Griswold had not been terminated for misconduct and was available for work.

Albertson's appealed to the ESD commissioner. The commissioner adopted the ALJ's first six findings and her conclusion that Griswold was not fired for disqualifying misconduct. Instead of adopting the ALJ's finding regarding

Griswold's work search, however, the commissioner entered the following additional finding:

> Over the past ten years, the claimant's employment has consisted of working as a meat wrapper in meat delicatessens. Prior to that period, she was a grocery buyer and ran a general store. In her current work search, the claimant is not seeking work in the grocery industry. The claimant is seeking work in the accounting and bookkeeping field. It is not indicated on the record that she has any training or experience in the accounting or bookkeeping fields.

The commissioner concluded Griswold was ineligible to receive unemployment benefits because she did not seek employment in the grocery industry, rendering herself not "available for work."

Both Albertson's and Griswold sought judicial review of the commissioner's decision. The two actions were consolidated. The superior court affirmed the commissioner's conclusion that Griswold did not engage in disqualifying misconduct, reversed the commissioner's conclusion that Griswold was not available for work, reinstated Griswold's unemployment benefits, and awarded Griswold attorney fees and costs.

## DISCUSSION

The purpose of the Employment Security Act (ESA) is to set aside funds for an unemployment reserve to "be used for the benefit of persons unemployed through no fault of their own."[1] The ESA is to "be liberally construed for the purposes of reducing involuntary unemployment and the suffering caused thereby to the minimum."[2]

■ In an appeal from an ESD decision, this court applies the appropriate standards of review directly to the agency record under the Administrative Procedure Act (APA).[3] We

---

[1] RCW 50.01.010.

[2] RCW 50.01.010.

[3] RCW 34.05.570; *Dermond v. Employment Sec. Dep't*, 89 Wn. App. 128, 132, 947 P.2d 1271 (1997).

grant relief from such decisions when an agency erroneously interpreted or applied the law, the decision was not supported by substantial evidence, or the decision was arbitrary or capricious.[4] The burden of proving that the agency action was invalid for any of these reasons lies with the party challenging the action.[5] Because we review the record and the administrative findings and conclusions on the same basis as the Superior Court, findings of fact and conclusions of law entered by the Superior Court are superfluous.[6]

█ The APA also describes the procedures by which agencies conduct internal review of lower officials' adjudicative decisions. Upon petition for internal review, agency heads may substitute their own findings for those made by the hearing officers, as the commissioner did here.[7] To the extent the ALJ's findings are modified or replaced by those of the commissioner, it is the commissioner's findings that are relevant to our review.[8] Here, except for the substitute finding and additional conclusion entered by the commissioner as indicated above, the ALJ's findings were adopted by the commissioner. Only one of the adopted findings is challenged, as discussed below.

Misconduct

█ Whether an employee's actions constitute misconduct is a mixed question of law and fact.[9] "On mixed questions of law and fact, we determine the law independently and then apply the law to the facts as found by the

---

[4] RCW 34.05.570(3).

[5] RCW 50.32.150; RCW 34.05.570(1)(a).

[6] *Valentine v. Department of Licensing*, 77 Wn. App. 838, 844, 894 P.2d 1352 (1995) (citing *Durham v. Employment Sec. Dep't*, 31 Wn. App. 675, 676, 644 P.2d 154 (1982)). Albertson's assigns error to the findings of fact and conclusions of law entered by the trial court, in addition to the commissioner's conclusions. We confine our review of these issues to the agency's findings and conclusions. *Valentine*, 77 Wn. App. at 844 n.2.

[7] RCW 34.05.464; *Valentine*, 77 Wn. App. at 844.

[8] *Valentine*, 77 Wn. App. at 844.

[9] *Dermond*, 89 Wn. App. at 132.

agency."[10] Factual findings are reviewed for substantial evidence sufficient to persuade a reasonable person that the declared premise is true.[11] This court gives great deference to the commissioner's factual findings and substantial weight to the agency's interpretation of the law.[12]

Griswold assigns error to part of one finding of the ALJ (adopted in its entirety by the commissioner), that the "interested employer policy prohibits the purchase of past pull-date meat at discounts by employees." Griswold did not cross-appeal because she prevailed in the trial court. This procedure is consistent with RAP 10.3(h). Albertson's challenges only the commissioner's conclusion that Griswold's actions did not constitute disqualifying misconduct.

■■ Under the ESA, an individual who is discharged for "misconduct connected with his or her work" is disqualified from receiving unemployment benefits.[13] Misconduct is defined as "an employee's act or failure to act in willful disregard of his or her employer's interest where the effect of the employee's act or failure to act is to harm the employer's business."[14] In adopting that definition, the Legislature intended to ensure that benefits would be denied only where the employee's conduct was both willful and harmful to the employer.[15] An employee acts with willful disregard " 'when he [or she] (1) is aware of his [or her] employer's interest; (2) knows or should have known that certain conduct jeopardizes that interest; but (3) nonetheless intentionally performs the act, willfully disregard-

---

[10] *Hamel v. Employment Sec. Dep't*, 93 Wn. App. 140, 145, 966 P.2d 1282 (1998), *review denied*, 137 Wn.2d 1036 (1999).

[11] *Galvin v. Employment Sec. Dep't*, 87 Wn. App. 634, 640-41, 942 P.2d 1040 (1997).

[12] *Wilson v. Employment Sec. Dep't*, 87 Wn. App. 197, 201, 940 P.2d 269 (1997).

[13] RCW 50.20.060.

[14] RCW 50.04.293.

[15] *Dermond*, 89 Wn. App. at 133 (quoting *Galvin*, 87 Wn. App. at 641-43).

ing its probable consequences.' "[16] Mere incompetence, bad judgment, or negligence does not constitute disqualifying misconduct.[17]

Albertson's bases its argument on several written policies, which it claims clearly prohibit employee purchases of past-pull-date meat. First, new employees are required to read and sign a form acknowledging causes for immediate dismissal without prior warning. One such cause is "unauthorized possession of or willful destruction or damage to Company funds, property or merchandise." Griswold signed this form in 1992.

Second, Albertson's employee handbook contains a provision regarding employee purchases of merchandise, which reads in relevant part:

> Employees must pay the same purchase price for merchandise as our customers. We do not permit employee discounts.
>
> . . . .
>
> Employees may mark down distressed and out-of-code product only if they have received prior approval by the department manager. In no event may an employee or department manager mark down any type of product at any time for his or her purchase or the purchase of other employees, friends and/or relatives. Department managers must receive the approval of the store director or person in charge of the store prior to marking down distressed or out-of-code product for employees, friends and/or relatives.

Griswold acknowledged receipt of the handbook by her signature.

Third, a November 18, 1996 memorandum to meat department managers and employees explained Albertson's policy for dating, pulling, and selling fresh meat. After a certain time, depending on the type of meat, employees are

---

[16] *Haney v. Employment Sec. Dep't*, 96 Wn. App. 129, 139, 978 P.2d 543 (1999) (alterations in original) (quoting *Hamel*, 93 Wn. App. at 146-47). Although the ALJ and the commissioner considered Griswold's case before this test had been enunciated, knowledge would necessarily have been an implicit consideration of both the ALJ's and commissioner's decisions.

[17] *Haney*, 96 Wn. App. at 139-40 (citing *Dermond*, 89 Wn. App. at 133).

instructed to "pull [it] from display and throw it out. It is waste, it cannot be sold in any form to our retail customers." Griswold signed her understanding of and agreement to comply with the policy. Albertson's particularly focuses on this memorandum, arguing it is "unambiguous" and clearly establishes Albertson's policy that past-pull-date meat must be thrown away and cannot be marked down for retail customers or purchased by employees at a markdown.

Finally, Griswold signed her understanding of Albertson's "Food Safety and Sanitation Training Update #3, Food-Borne Illness" in which three types of food contamination are explained, as well as methods for preventing hepatitis A.

In addition to these documents, Albertson's relies on the testimony of Griswold's store director and meat manager. While store director Peter Carley testified that the policy prohibits sale of past-pull-date meat to employees, he also testified that the handbook entitles employees to properly authorized markdowns on past-pull-date products not available to retail customers, and that he is aware his statement as to the meat policy is in conflict with the handbook.

██ Griswold's meat manager, Fred Lamuth, testified he never discounted past-pull-date meat for his employees, and never authorized the discount of past-pull-date meat. But the unchallenged finding was that the "testimony of Fred Lamuth was not credible."[18] Albertson's reliance on Lamuth's testimony is thus misplaced.

██ We first observe that the policies appear to permit, not prohibit, purchases of past-pull-date meat by employees where authorized by the department manager. The employee handbook contains a general statement that employees must pay the same price as retail customers, that employee discounts are not permitted. But it then specifically provides that markdown of "distressed and out-of-code

---

[18] We treat unchallenged findings as verities on appeal. *See Tapper v. Employment Sec. Dep't*, 122 Wn.2d 397, 407, 858 P.2d 494 (1993).

product for employees" may be authorized by the department manager with approval of the store director.[19] The apparent meaning of these two sections is that there is no automatic employee discount, but products that cannot be marketed to the public because they are past their "pull dates" may be marked down for employees. The unchallenged finding is that Griswold's department managers routinely authorized employee purchases of past-pull-date meat, and that many employees made such purchases.

Albertson's argues that even if Griswold's manager authorized the purchase, "all that can be said is that both the manager and Griswold violated the [c]ode [d]ating [p]olicy." While the handbook requires that the department manager first obtain approval of the store director, the individual employee is unlikely to be a party to such communication, and there was no evidence that Griswold had notice of any lack of authority on the part of her department manager. Albertson's does not explain how the employee is to discern whether the manager has followed the handbook procedures, or why the employee should not be able to rely on the handbook without making further inquiries.

As to the code dating policy, which is the memorandum requiring past-pull-date meat be thrown out and not sold to retail customers, its meaning is uncertain. At least two employees testified that "thrown out" in the memorandum meant the product could not be sold to retail customers. At least one employee testified that he purchased discounted past-pull-date meat from store director Carley at Carley's checkstand. Carley testified, however, that the term "retail customers" includes employees. If so, it is unclear why the handbook treats them differently.

Relying on *Galvin v. Employment Security Department*,[20] Albertson's argues that even assuming Griswold's manager

---

[19] Albertson's brief quotes the handbook but omits the portion that authorizes employees to mark down products with the approval of their department manager and requires department managers to receive prior approval of the store director.

[20] *Galvin v. Employment Sec. Dep't*, 87 Wn. App. 634, 942 P.2d 1040 (1997).

had authorized her purchases, Griswold was not entitled to rely on such authorization in the face of company policy to the contrary. *Galvin* does not stand for the proposition Albertson's believes. In *Galvin*, an employee's immediate supervisor told his work crew that, in his opinion, it was not necessary to obtain advance approval of all vacations, as the employer's policies required. Galvin argued that her failure to obtain advance approval thus did not constitute misconduct. We rejected her argument because she had a long history of absenteeism, had been repeatedly warned about unscheduled vacations, and had been required to attend monthly reviews of her attendance with her supervisor's superior as a condition of continued employment. Her supervisor's superiors had "repeatedly, clearly, . . . . and unequivocally" communicated to her personally that she must schedule her vacations in advance as a condition of continued employment.[21] In the face of such personally communicated insistence that Galvin herself must comply with the notice requirements, we held she could not rely on her immediate supervisor's willingness to forgo it for his crew. *Galvin* did not address whether an employee could ever rely on a manager's decision made in apparent contradiction to the formal policies of the employer.

In any event, the facts here are not similar. Griswold had not been subject to disciplinary action and had received no prior warnings. Nor had her supervisor authorized a practice that appeared to depart from company policy. Rather, her supervisor instructed her to price the meat at substantial discounts for Albertson's employees, in part to increase the department's sales figures. In doing so, her supervisor appeared to be acting within company policy, not outside it.

Albertson's also relies on *City of Picayune v. Mississippi Employment Security Commission*, in which the Mississippi Supreme Court held an employee engaged in disqualifying work-connected misconduct when she accepted $700 worth of collect telephone calls at work, allegedly with permission

---

[21] *Galvin*, 87 Wn. App. at 645-46.

from her supervisors.[22] Albertson's reliance here is also misplaced. Even assuming Mississippi unemployment compensation law resembles Washington law, the employer in *City of Picayune* issued numerous directives unequivocally prohibiting the conduct in which the employee engaged.[23]

The ALJ and the commissioner both found that Albertson's policy prohibited employee purchase of past-pull-date discounted meat. Griswold assigns error to this part of the findings. As discussed, the clarity of Albertson's policies is highly debatable, but we need not determine that the finding is in error because, made as it was in the context of a conclusion that no misconduct occurred, it is in effect a finding of corporate policy and not a finding that the policy was known to employees or enforced by managers—quite the contrary, especially when read with the other findings regarding routinely authorized purchases.

Finally, even if corporate policy were clear in this regard, Griswold's violation of the policy would be willful misconduct only if she knew her violation jeopardized her employer's interests.[24] Regarding the company's interests, Albertson's points to its potential liability to those consuming the meat should it be no longer fit for consumption, and describes Griswold's purchase of the meat as callous disregard for the safety of others constituting gross negligence. Albertson's argument assumes too much. The record does not establish the relationship between pull dates and spoilage, nor, given the long history of these purchases, why the dangers described by Albertson's have never materialized in the form of injury. Albertson's does not explain why an employee observing the frequency of these authorized purchases should conclude the company's interests were

---

[22] *City of Picayune v. Mississippi Employment Sec. Comm'n,* 525 So. 2d 1330 (Miss. 1988).

[23] We also note that no court, including a Mississippi court, has cited *City of Picayune.*

[24] *See Haney v. Employment Sec. Dep't,* 96 Wn. App. 129, 139, 978 P.2d 543 (1999).

violated by a practice which benefited the company's sales figures.

In sum, Albertson's written corporate policies were at best unclear, and were inconsistent with company practice. Because the written directives appear to authorize a manager to permit the employee's conduct, the commissioner did not err in refusing to fault the employee for engaging in a common practice encouraged and authorized by the manager. Such conduct does not constitute willful disregard of the employer's interests so as to disqualify Griswold from unemployment benefits. The ALJ, the commissioner, and the superior court all found no misconduct here, and we agree.

## Availability for Work

Under the ESA, an unemployed individual is eligible for benefits if:

> He or she is able to work, and is available for work in any trade, occupation, profession, or business for which he or she is reasonably fitted. To be available for work an individual must be ready, able, and willing, immediately to accept any suitable work which may be offered to him or her and must be actively seeking work pursuant to customary trade practices and through other methods when so directed by the commissioner or the commissioner's agents.[25]

"Suitable work" is defined as:

> [E]mployment in keeping with the individual's prior work experience, education, or training. If the individual lacks such prior work experience, education, or training or such employment is not available in the general area[,] suitable work shall include any employment which the individual would have the physical and mental ability to perform.[26]

The question is whether, given Griswold's prior work experience, she was seeking "suitable work" and therefore was "available for work" as required by the ESA.

The ALJ found that Griswold was available for and

---

[25] RCW 50.20.010(3).

[26] WAC 192-16-021(1)(a).

actively seeking suitable work, but the commissioner found to the contrary because, "It is not indicated on the record that she has any training or experience in the accounting or bookkeeping fields."

Griswold challenges the commissioner's finding regarding her lack of experience in accounting or bookkeeping. The only evidence on this point came from Griswold, who testified that she ran a general store for seven years and did its books. She testified she was seeking similar work, in part because she doubted she could find work in the grocery industry after her termination by Albertson's.

Griswold's concerns about finding work in the local grocery business appear to have a basis in fact. After discharging Griswold, Albertson's contacted the police. In Griswold's "Statement on Discharge from Work" submitted to the ESD, Griswold wrote that her former boss thought she had been fired for theft. At least one Albertson's employee testified before the ALJ that he had been told Griswold had been fired for stealing, and when he asked meat manager Lamuth about it, Lamuth replied, "[I]t depends [on] what you call stealing."

The commissioner apparently disregarded Griswold's previous work experience because it did not rise to the level of professional accounting. This was not the gist of the testimony, however. The term "accounting" was not used by Griswold in that narrow sense, but rather to describe her work keeping books for a general store. Because the commissioner's additional finding is not supported by substantial evidence and the vacated finding of the ALJ is so supported, we vacate the commissioner's finding and reinstate the ALJ's finding of fact 7. We hold that Griswold was seeking suitable work.

The remaining issue is whether the findings support the commissioner's conclusion that Griswold was not available for work. Both the ALJ and the commissioner based their decisions on *Jacobs v. Office of Unemployment Compensation & Placement*, in which the Supreme Court held that a claimant was unavailable for work because she restricted

her job search to daytime employment, failed to meet her burden of showing she had transportation if work were offered, and failed to show that she actively sought work as required under the statute.[27] In reaching its decision, the court reviewed nationwide authority, which generally denied benefits to claimants who placed geographic and specific shift restrictions on their searches.[28] Griswold did not restrict her search in this manner, however, so *Jacobs* is not particularly helpful.

The commissioner also relied on *Arima v. Employment Security Department*, where this court held that an academic year (nine-month) school district employee was ineligible for unemployment benefits during the summer months because she limited her job search to those months.[29] The court noted that in such a case, "granting such benefits would be inconsistent with the fundamental concept of a program which is designed to act as a buffer or hedge against the ravages of sudden and unexpected loss of one's livelihood."[30] Again, this case is not particularly helpful.

■ As the ALJ and commissioner both recognized, the question is whether Griswold placed restrictions on her availability for work that would seriously affect her chance of becoming employed. We hold she did not. She requested assistance from her union in obtaining reinstatement at Albertson's or employment in other grocery stores, declared her eligibility for work as a meat wrapper, and otherwise applied for bookkeeping positions commensurate with her experience. She did not place geographic or time constraints on her search for employment, never refused offers of employment, and did not refuse job referrals. At no time

---

[27] *Jacobs v. Office of Unemployment Compensation & Placement*, 27 Wn.2d 641, 660, 179 P.2d 707 (1947). *Jacobs* was based on almost identical language in the unemployment compensation act. *See Jacobs*, 27 Wn.2d at 645 (discussing Rem. Supp. 9988-206(c) (1945)).

[28] *Jacobs*, 27 Wn.2d at 652-60.

[29] *Arima v. Employment Sec. Dep't*, 29 Wn. App. 344, 351, 628 P.2d 500 (1981).

[30] *Arima*, 29 Wn. App. at 351.

did she indicate she would refuse a job in the grocery field—she indicated merely that she expected a cold reception in the industry, for which expectation she had a reasonable basis. Finally, she received no specific direction from the ESD regarding her job search.

Griswold's job search satisfied the statutory requirements. The commissioner's additional conclusion of law is not supported by the evidence and erroneously states the law, and it is therefore vacated. We reinstate the ALJ's conclusion of law 8, and hold Griswold is eligible for benefits under RCW 50.20.010(3).

Attorney Fees

Albertson's petitioned for judicial review of the commissioner's conclusion that Griswold did not engage in misconduct. Griswold cross-petitioned for judicial review of the commissioner's conclusion that she was not "available for work." The petitions were consolidated as a result of an uncontested motion by ESD. The superior court reversed the commissioner's ruling as to availability for work and affirmed the ruling as to misconduct, a result entirely favoring Griswold on both issues. The court granted Griswold's request for attorney fees under RCW 50.32.160 in the amount of $13,132. Albertson's challenges the award of fees to the extent it compensates Griswold's attorney for responding to Albertson's appeal of the commissioner's decision on the misconduct issue, arguing such fees are not authorized by RCW 50.32.160.

██ ██ Whether a statute authorizes attorney fees is a question of law subject to de novo review.[31] Once entitlement to attorney fees is established, a trial court has broad discretion in determining the amount of attorney fees to be awarded, so long as the award is reasonable.[32] Reasonableness of the amount is reviewed for an abuse of discretion.

██ Under RCW 50.32.160, a claimant for unemploy-

[31] *Tradewell Group, Inc. v. Mavis*, 71 Wn. App. 120, 126, 857 P.2d 1053 (1993).

[32] *American Nat'l Fire Ins. Co. v. B&L Trucking & Constr. Co.*, 82 Wn. App. 646, 669, 920 P.2d 192 (1996), *aff'd*, 134 Wn.2d 413, 951 P.2d 250 (1998).

ment benefits is entitled to reasonable attorney fees and costs if the decision of the commissioner is reversed or modified on appeal to the courts:

> It shall be unlawful for any attorney engaged in any appeal to the courts on behalf of an individual involving the individual's application for initial determination, or claim for waiting period credit, or claim for benefits to charge or receive any fee therein in excess of a reasonable fee to be fixed by the superior court in respect to the services performed in connection with the appeal taken thereto and to be fixed by the supreme court or the court of appeals in the event of appellate review, and if the decision of the commissioner shall be reversed or modified, such fee and the costs shall be payable out of the unemployment compensation administration fund. In the allowance of fees the court shall give consideration to the provisions of this title in respect to fees pertaining to proceedings involving an individual's application for initial determination, claim for waiting period credit, or claim for benefits. In other respects the practice in civil cases shall apply.[33]

The purpose of this provision, when read with RCW 50.32.100 and RCW 50.32.110,[34] is "to provide for regulation of attorney fees incurred in relation to administrative

---

[33] RCW 50.32.160.

[34] RCW 50.32.100 provides:

> In all proceedings provided by this title prior to court review involving dispute of an individual's initial determination, or claim for waiting period credit, or for benefits, the fees of all witnesses attending such proceedings pursuant to subpoena shall be paid at the rate fixed by such regulation as the commissioner shall prescribe and such fees and all costs of such proceedings otherwise chargeable to such individual, except charges for services rendered by counsel or other agent representing such individual, shall be paid out of the unemployment compensation administration fund. In all other respects and in all other proceedings under this title the rule in civil cases as to costs and attorney fees shall apply: PROVIDED, That cost bills may be served and filed and costs shall be taxed in accordance with such regulation as the commissioner shall prescribe.

RCW 50.32.110 provides:

> No individual shall be charged fees of any kind in any proceeding involving the individual's application for initial determination, or claim for waiting period credit, or claim for benefits, under this title by the commissioner or his representatives, or by an appeal tribunal, or any court, or any officer thereof. Any individual in any such proceeding before the commissioner or any appeal tribunal may be represented by counsel or other duly authorized agent who

or court proceedings."[35] "[W]hen the commissioner erroneously denies unemployment compensation, the subsequent fees and costs incurred in court proceedings are compensable from state funds."[36]

The language of the statute is not a model of clarity, but it casts a broad net. Albertson's was seeking to reverse the commissioner's decision that no disqualifying misconduct occurred. In responding on her behalf, Griswold's attorney was engaged in an appeal involving her claim for benefits.

The real thrust of Albertson's argument is that because Albertson's did not obtain a reversal or modification of the commissioner's decision on the misconduct issue, no fees are awardable for Griswold's attorney's work on that issue. This argument makes sense only if the statute contemplates that where a claimant is partially successful and partially unsuccessful and both parties appeal, fees incurred defending the employer's appeal must be considered separately from fees incurred prosecuting the claimant's appeal. The statute contains no such requirement. It plainly provides for fees on appeal if the commissioner's decision is reversed. It was. A fee determination under the statute is not made by parsing the commissioner's decision and the parties' issues to determine which issue each argued and upon which each prevailed. The plain intent of the Legislature is that a successful claimant appellant shall have fees on appeal.[37] Griswold was successful because she prevailed on her appeal and successfully defended against Albertson's appeal. Albertson's argument not only contravenes legislative intent, it would discourage consolidated appeals, burden judicial resources, and create confusion. Griswold was entitled to reasonable fees incurred in superior court.

shall neither charge nor receive a fee for such services in excess of an amount found reasonable by the officer conducting such proceeding.

[35] *Ancheta v. Daly*, 77 Wn.2d 255, 266, 461 P.2d 531 (1969).

[36] *Ancheta*, 77 Wn.2d at 266.

[37] *Ancheta*, 77 Wn.2d at 266.

Albertson's also argues that Griswold's attorney was, at least as to Albertson's appeal on the misconduct issue, a "mere volunteer," and therefore an award of fees for his work on the issue is not reasonable. Whether fees are awarded for particular services is indeed a reasonableness question, and thus lies within the trial court's sound discretion.[38] It was for the superior court to determine whether and to what extent Griswold's attorney added value to the debate by his work on her behalf. Albertson's has pointed to nothing in the record suggesting that Griswold's attorney merely offered cumulative argument, and relies instead on the general proposition that fees were inappropriate because another party also defended the commissioner's decision on that issue. But it is not self-evident that an individual's attorney could have nothing by way of additional argument to add to the work of the assistant attorney general, whose client is the commissioner and whose objective is affirmance of the agency decision, not to ensure benefits are awarded.[39] Albertson's has not shown the trial court abused its discretion, and we decline to disturb the fee award.

In light of our decision, we grant Griswold's request for fees and costs on appeal under RCW 50.32.160.[40] Griswold is instructed to comply with RAP 18.1(d).

## CONCLUSION

We affirm the commissioner's decision that Griswold did not engage in disqualifying misconduct but reverse the commissioner's decision that Griswold is ineligible for benefits because she was unavailable for work. We thus hold Griswold is eligible for benefits and affirm the superior court's decision to that effect, as well as its award of

---

[38] *See American Nat'l Fire Ins.*, 82 Wn. App. at 669.

[39] *See* RCW 50.32.090 ("The commissioner shall be deemed to be a party to any judicial action involving any such decision and shall be represented in any such judicial action by the attorney general.").

[40] *See, e.g., Nielsen v. Employment Sec. Dep't*, 93 Wn. App. 21, 43, 966 P.2d 399 (1998).

attorney fees. Finally, Griswold's request for attorney fees on appeal is granted.

BECKER, A.C.J., and APPELWICK, J., concur.