[No. 66851-0-I. Division One. May 14, 2012.]

CHARLES DANIELS, *Respondent*, v. THE EMPLOYMENT SECURITY
DEPARTMENT, *Appellant*.

722

*Robert M. McKenna, Attorney General,* and *Anthony P. Pasinetti, Assistant,* for appellant.

*Rosemary A. Villarreal,* for respondent.

¶1 ELLINGTON, J. — Charles Daniels was discharged from his job as a private security officer for failing to report to work on time and in uniform. The policy was reasonable and Daniels had received oral and written warnings. The Employment Security Department (Department) commissioner found Daniels was discharged for misconduct and therefore ineligible for unemployment benefits. We agree. We reverse the superior court's decision to the contrary.

## BACKGROUND

¶2 Charles Daniels joined Star Protection Agency as a temporary security officer in November 2007. Lamar Kelly was one of his supervisors.

¶3 In September 2008, Kelly wrote a disciplinary action form concerning Daniels' tardiness. Kelly wrote that Daniels was more than an hour late for his shift that day. He indicated that Daniels had been "verbally warned numerous times" about arriving late, including on June 17, June 19, and June 20, 2008.[1] Daniels' co-workers reported that he had been 30 minutes to 2 hours late on at least eight occasions. Additionally, Kelly stated that he saw Daniels "being out of uniform several times when arriving at duty post."[2]

¶4 In October 2008, Kelly wrote another disciplinary action form concerning Daniels' failure to follow instruc-

---

[1] Certified Appeals Board Record (CABR) at 80.

[2] *Id.*

tions, unsatisfactory work quality, and violation of company policies. The notice concerned Daniels' excessive, unauthorized use of the Internet during work hours. Kelly gave Daniels other oral and written warnings thereafter and, on more than one occasion, Kelly warned Daniels that further policy violations would result in his discharge.

¶5 Daniels testified he had received an employee handbook as part of his training and was familiar with the company's policies about arriving on time and wearing a uniform. He admitted he was sometimes late for his shift, though he insisted he always called Kelly in advance to let him know. Daniels also acknowledged that he received more than one disciplinary form, including the two described above.

¶6 On November 6, 2009, Daniels was scheduled to begin his shift at 10:00 p.m. He testified that he arrived at the building an hour and a half to two hours early. He had his uniform with him and intended to change in the building's restroom. He found the building locked. Daniels testified he called Kelly and left a message indicating he would wait in his car. He did not change into his uniform.

¶7 Kelly testified he received no calls from Daniels that night. He arrived at the job site at 9:45 p.m. and could not find Daniels. Kelly conducted the first security rove himself. When he finished at about 10:45 p.m., he still did not see Daniels on-site. He called Daniels and received "a groggy 'Hello'."[3] He found Daniels sitting in his car under a blanket, out of uniform. "It looked like he was sleeping."[4] Daniels was discharged.

¶8 Daniels applied for and was initially granted unemployment benefits. Star appealed to the Office of Administrative Hearings, contending that Daniels had been discharged for misconduct. Administrative Law Judge Cynthia Morgan noted that Kelly and Daniels disagreed about the

---

[3] CABR at 17.

[4] Id.

nature and frequency of the warnings Daniels received and concluded the employer had not established misconduct.

¶9 Star petitioned for review. Department Commissioner Annette Womac made additional factual findings. She found that Daniels was aware of the company's written policy that employees must report to work on time, dressed in uniform, and ready to work. She found that Daniels was repeatedly warned about tardiness and failure to be in uniform at the start of his shift. She also found that Kelly's testimony about giving Daniels several written and verbal warnings following the September 2008 written warning "is deemed credible and is included herein as fact."[5]

¶10 As to the final incident, the commissioner found that based "on prior experience," Daniels assumed Kelly would arrive before the shift started and allow him to change inside the building,[6] that he had "done so before without reprimand,"[7] but given that Daniels arrived at the job site at least 90 minutes before his shift began, "it defies logic that he did not drive elsewhere to change clothes."[8] Daniels thus "exhibited a wanton disregard of his employer's interest."[9] The commissioner concluded by noting:

> Given the circumstances, the claimant's tardiness was inexcusable, as was his violation of the employer's policy regarding uniforms at the work site. Given the prior warnings, the claimant's course of action (or lack thereof) cannot be attributed to an isolated incident of mistake or poor judgment. Misconduct has been established.[10]

The commissioner reversed the administrative law judge and denied benefits.

---

[5] CABR at 103.

[6] Id.

[7] Id.

[8] CABR at 104.

[9] Id.

[10] Id.

¶11 Daniels appealed to King County Superior Court, which reversed the commissioner. This appeal followed.

## DISCUSSION

¶12 The Washington Administrative Procedure Act (APA), chapter 34.05 RCW, governs judicial review of a final decision by the Department commissioner.[11] An appellate court sits in the same position as the superior court and applies the APA standards directly to the administrative record.[12] The decision on review is that of the commissioner, not the underlying decision of the administrative law judge.[13]

¶13 The "burden of demonstrating the invalidity of agency action is on the party asserting invalidity," in this case, Daniels.[14] The APA allows a reviewing court to reverse if, among other things, the commissioner based her decision on an error of law, if substantial evidence does not support the decision, or if the decision was arbitrary or capricious.[15]

¶14 Daniels contends the findings are unsupported by substantial evidence and the conclusion that he was discharged for misconduct is an error of law. Whether an employee's behavior constitutes misconduct, rendering him ineligible for unemployment benefits, is a mixed question of law and fact.[16] "Great deference is given to the [c]ommissioner's factual findings and substantial weight is given to the agency's interpretation of the law."[17] The

---

[11] *Verizon Nw., Inc. v. Emp't Sec. Dep't*, 164 Wn.2d 909, 915, 194 P.3d 255 (2008).

[12] *Id.*

[13] *Id.*

[14] RCW 34.05.570(1)(a); *Anderson v. Emp't Sec. Dep't*, 135 Wn. App. 887, 893, 146 P.3d 475 (2006).

[15] RCW 34.05.570(3)(d)-(e), (i); *Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993).

[16] *Tapper*, 122 Wn.2d at 402-03.

[17] *Galvin v. Emp't Sec. Dep't*, 87 Wn. App. 634, 641, 942 P.2d 1040 (1997).

process of applying the law to the facts is a question of law subject to de novo review.[18] We review the findings for substantial evidence in light of the whole record.[19]

 ¶15 Under the Employment Security Act (ESA), Title 50 RCW, claimants are disqualified from receiving unemployment benefits when they have been discharged for work-related misconduct.[20] The act defines "misconduct" to include, among other things, "[w]illful or wanton disregard of the rights, title, and interests of the employer or a fellow employee."[21] Certain types of conduct are misconduct per se. Among these are "[r]epeated inexcusable tardiness following warnings by the employer"; and "[v]iolation of a company rule if the rule is reasonable and if the claimant knew or should have known of the existence of the rule."[22]

¶16 "Repeated inexcusable tardiness" means "repeated instances of tardiness that are unjustified or that would not cause a reasonably prudent person in the same circumstances to be tardy."[23] To rise to this level, an "employer must have warned [the employee] at least twice, either verbally or in writing, about [the] tardiness, and violation of such warnings must have been the immediate cause of [the] discharge."[24]

 ¶17 Relying in part on the written disciplinary action forms, the commissioner found Daniels "was repeatedly

---

[18] *Id.* (citing *Tapper*, 122 Wn.2d at 403).

[19] RCW 34.05.570(3)(e); *Nat'l Elec. Contractors Ass'n v. Emp't Sec. Dep't*, 109 Wn. App. 213, 226, 34 P.3d 860 (2001).

[20] RCW 50.20.066(1).

[21] RCW 50.04.294(1)(a).

[22] RCW 50.04.294(2)(b), (f). Misconduct does not include "(a) Inefficiency, unsatisfactory conduct, or failure to perform well as the result of inability or incapacity; (b) Inadvertence or ordinary negligence in isolated instances; or (c) Good faith errors in judgment or discretion." RCW 50.04.294(3).

[23] WAC 192-150-210(1).

[24] *Id.*

warned by his supervisor that tardiness was not acceptable."[25] The commissioner also found Daniels "received numerous additional verbal warnings from his supervisor to report for work on time" following the written warning in September 2008.[26]

¶18 Daniels contends these findings are not supported by substantial evidence. He points out that the written disciplinary forms do not bear his signature and argues there is no evidence that he "was even aware of these documents."[27] But Daniels testified that he "believe[d]" he had received the disciplinary forms.[28] And Kelly testified he gave Daniels several written and oral warnings. The commissioner expressly found Kelly's testimony credible and included it as fact.

■ ■ ¶19 Daniels also challenges the finding that a written policy required employees to report for work on time and in uniform. He contends there is no substantial evidence to support the finding because no written policy or handbook was made part of the record. First, there is no requirement in the ESA or the Department's regulations that a company rule be written or contained in a handbook for its violation to constitute misconduct. The statute requires only that the rule be "reasonable" and one of which the employee "knew or should have known."[29] An employee knew or should have known about a rule if he was "provided an employee orientation on company rules, . . . provided a copy or summary of the rule in writing, or the rule is

---

[25] CABR at 102.

[26] CABR at 102-03.

[27] Resp't's Br. at 35-36.

[28] CABR at 39. Daniels' testimony suggests he had received other written warnings as well. He testified that he was confused "[w]henever I received a disciplinary form," and that "Mr. Kelly was pretty regular about just write [sic] you up. Whenever he wrote me up, I really couldn't understand it." *Id.*

[29] RCW 50.04.294(2)(f).

posted."[30] Second, Daniels testified that he "went through a training and I believe later on we received a handbook and Mr. Kelly delivered the handbook to the sites."[31] He said he was familiar with the policies concerning uniforms and being at work on time and acknowledged that "Mr. Kelly would inform everybody before he trained us."[32] Additionally, one of the written disciplinary notices advised Daniels to be on time "in keeping with the directives outlined in the Star Protection Agency employee manual."[33]

¶20 Finally, Daniels contends that the description of the final incident precipitating his termination is not substantial evidence to support the commissioner's findings about that incident because it is "unsigned, undated, written apparently anonymously, and shows no sign of the person to whom it was addressed."[34] But the document is entirely consistent with Kelly's testimony, which provides independent substantial evidence.[35]

¶21 Daniels also contends the commissioner's conclusion that he was discharged for misconduct is an error of law. He argues that his failure to be at his post and in uniform at the beginning of his shift cannot be considered willful and wanton disregard of Star's interests, that he was "not late to the job site," and that he reasonably assumed that he would be able to change into his uniform once Kelly arrived to unlock the building.[36]

■ ¶22 The Department's regulations define "willful" as "intentional behavior done deliberately or knowingly, where you are aware that you are violating or disregarding the

---

[30] WAC 192-150-210(5).

[31] CABR at 40. Kelly also testified that he "believe[d]" employees are provided a copy of company policies at hire. CABR at 24.

[32] *Id.*

[33] CABR at 80.

[34] Resp't's Br. at 36 (referring to exhibit 6, page 1, CABR at 77).

[35] Further, Daniels does not dispute the content of the document.

[36] Resp't's Br. at 19-20.

rights of your employer."[37] Given the numerous previous warnings about being on time and in uniform, Daniels' conduct was plainly willful.

¶23 Daniels next argues that his tardiness does not constitute misconduct under "decades of case law."[38] He relies on *Shaw v. Employment Security Department*,[39] *Liebbrand v. Employment Security Department*,[40] and *Galvin v. Employment Security Department*[41] to argue, essentially, that more egregious conduct has not disqualified others from benefits, so he should not be disqualified either.

¶24 The cases on which Daniels relies interpret previous versions of the ESA, which did not identify repeated unexcused tardiness as misconduct per se. In *Shaw*, the court noted the absence of statutory guidance and decided that tardiness must be "chronic or excessive" to constitute misconduct.[42] The statute now contains a "misconduct" definition that does not require tardiness to be chronic or excessive to be considered misconduct. Rather, it need only be "[r]epeated," "inexcusable" and "following warnings."[43] The agency has further defined tardiness-related misconduct as "repeated instances of tardiness that are unjustified" after the employer has "warned you at least twice, either verbally or in writing."[44]

¶25 Further, *Galvin*, *Liebbrand*, and *Shaw* do not articulate a minimum amount of tardiness/absences before the Department may find willful misconduct. Rather, the courts

[37] WAC 192-150-205(1).

[38] Resp't's Br. at 20.

[39] 46 Wn. App. 610, 731 P.2d 1121 (1987).

[40] 107 Wn. App. 411, 27 P.3d 1186 (2001).

[41] 87 Wn. App. 634, 942 P.2d 1040 (1997).

[42] *Shaw*, 46 Wn. App. at 613-14.

[43] RCW 50.04.294(2)(b).

[44] WAC 192-150-210(1).

in each ultimately held misconduct could be established where an employee is repeatedly and inexcusably late or absent following warnings. Such is the case here.

¶26 Daniels also challenges the commissioner's conclusion that Daniels' violation of the employer's policy regarding uniforms at the work site established misconduct.

¶27 First, Daniels points out that Star's Human Resources Generalist Nancy Glass testified that Daniels was fired for being tardy, not for being out of uniform. He argues the commissioner therefore erred in basing her conclusion that he was discharged for misconduct in part on his failure to be in uniform at the start of his shift. But Glass testified that she lacked personal knowledge of the final incident and deferred to Kelly, who was equally responsible for the termination.[45] Kelly's testimony refers to Daniels' repeated failure to be in uniform as the basis of numerous disciplinary actions, including his termination.

¶28 Daniels also challenges the conclusion as unsupported by substantial evidence. He emphasizes the commissioner's findings that Daniels assumed, based on prior experience, that his supervisor would arrive before the beginning of the shift and allow him to change inside the building. He argues this finding is inconsistent with the commissioner's later finding that "it defies logic that he did not drive elsewhere to change clothes" when he arrived at the job site 90 minutes early.[46] Daniels argues there is no evidence that "there were places that Mr. Daniels might have been able to change clothes—safely and legally—at 9:30 p.m. on a cold November night."[47]

¶29 But Kelly testified that he arrived at the jobsite to open the door 15 minutes before Daniels' shift began. Even

---

[45] Glass explained Daniels' termination in part by saying, "I just know that there was a lot of situations where he was out of uniform." CABR at 15.

[46] CABR at 104.

[47] Resp't's Br. at 39.

if Daniels reasonably expected to be able to change into his uniform inside the building, he had that opportunity and failed to take it. Instead, he remained in his car for another hour.

¶30 The record as a whole supports the commissioner's conclusion that Daniels willfully violated a reasonable company rule. We reverse the superior court and reinstate the commissioner's decision.[48]

BECKER and COX, JJ., concur.

Review denied at 175 Wn.2d 1028 (2012).

---

[48] Given this disposition, it is unnecessary to address Daniels' request for attorney fees.