# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| HAROLD GARY WILLIAMS, | No. 49362-4-II |
| Respondent, | |
| v. | |
| STATE OF WASHINGTON EMPLOYMENT SECURITY, | UNPUBLISHED OPINION |
| Appellant. | |

MELNICK, J. — After losing his job as a dockworker and hostler at Old Dominion Freight Lines (Old Dominion), Harold Gary Williams was denied unemployment benefits. Williams argues that because his actions did not amount to misconduct under the Employment Security Act (Act),[1] he should have been awarded unemployment benefits. We agree and reverse the Commissioner's decision.

## FACTS

I. BACKGROUND

Williams worked for Old Dominion for approximately eight years. He spent the majority of his career with Old Dominion working as a dockworker, loading and unloading cargo trailers. He worked the last eight months as a hostler, responsible for moving cargo trailers to and from the loading docks. Williams received no formal hostler training.

---

[1] Title 50 RCW.

Hostlers rely on electronic move orders to direct their activity. The orders are communicated through a computer system to move the trailers. The move order originates with the dockworker responsible for loading or unloading the trailer. Prior to 2013, the dockworker would secure the trailer door after the completion of loading or unloading. The dockworker would then indicate on the computer that the trailer was ready to be moved. Supervisors had the responsibility to confirm the above steps before forwarding the move order to the hostler, who would then move the trailer to its destination.

In late 2013 or early 2014, Old Dominion instituted a "door check" policy to reduce the number of accidents occurring on its loading docks. Safety incidents were common under the pre-2013 system, including instances where hostlers moved trailers with unsecured doors or with forklifts still inside.

While closing the trailer door remained the dockworkers' job, under the door check policy the dockworker, the supervisor, and the hostler all had responsibility to confirm the door was secure and the trailer was ready to move. Hostlers were expected to visually check the trailer doors prior to each move. Old Dominion did not publish the new policy in an employee handbook, post it in the workplace, or otherwise circulate it to employees. However, supervisors communicated the policy change in monthly safety meetings. Hostlers' duties often prevented them from attending these meetings.

Old Dominion employees did not immediately comply with the new policy. Hostlers would check the trailers if they saw or heard something unusual, rather than prior to every move as required by the policy. One dockworker testified that he witnessed violations of the door check policy frequently, stating that at least once or twice a day he saw trailers pulled with doors open or people still inside. The dockyard supervisor acknowledged that Old Dominion employees did

not always comply with the policy. However, prior to Williams, no other employee received discipline for violating the door check policy.

On September 18, 2015, Williams received an electronic move order from an inexperienced dockworker who mistakenly believed a trailer was ready to be moved. A forklift entered the trailer to continue unloading it. Relying on the move order, Williams moved the trailer without checking the rear door. As Williams pulled the trailer away from the dock, the back of the forklift fell out of the trailer and hit the ground.

The forklift driver, who remained on the forklift during the accident, was not injured. The forklift received damage but was later repaired. The dockworker who sent the premature move order received a verbal warning. Old Dominion fired Williams. Prior to this incident, Williams had a clean employment record, free of disciplinary actions for safety violations. No other employee had been fired for violating the door check policy.

II.    PROCEDURAL HISTORY

After being discharged from Old Dominion, Williams applied for unemployment benefits. The Department of Employment Security (Department) denied his claim, citing misconduct under RCW 50.04.294(1)(d). An administrative law judge (ALJ) affirmed the Department's determination.

The ALJ made numerous findings of fact, including the following: Old Dominion implemented a new, reasonable policy that required hostlers to visually check trailer doors, Old Dominion informed employees, including Williams, of this policy, Williams did not have any prior

warnings for safety violations but he had been involved in a similar incident previously,[2] and Old Dominion's witnesses were more credible.

The ALJ made numerous conclusions of law including the following: Old Dominion had proven by a preponderance of the evidence that it discharged Williams for careless or negligent misconduct, Williams's failure to visually check the trailer "had the potential for grievous bodily harm to the employee and substantial property damage," and hostlers are ultimately responsible to determine when it is safe to move the trailer. Clerk's Papers (CP) at 145. The ALJ also concluded Williams "should have had a heightened sense regarding safety" after his involvement "in a similar accident a few years ago." CP at 145.

Williams petitioned for review of the ALJ's decision. The Department's Commissioner affirmed. The Commissioner adopted the ALJ's findings of fact and conclusions of law. The Commissioner additionally concluded that Williams's actions constituted disqualifying misconduct for two reasons. First, his failure to visually check the trailer door constituted a "willful and wanton disregard of the rights, title and interests of his employer" because Williams's conduct violated "a reasonable employer policy" that he either knew or should have known about. CP at 162. Second, Williams's conduct "evinced carelessness or negligence *of such degree* as to show a substantial disregard of the employer's interest." CP at 162.

---

[2] Several years before his termination, Williams moved a trailer while a dockworker remained inside. The dockworker did not sustain any injuries, damages did not result, and Williams did not receive discipline. At the time of this incident, Williams was employed as a dockworker but temporarily filled in as a hostler.

Williams appealed to the Pierce County Superior Court, which reversed.[3]  The court determined that, in denying Williams unemployment benefits, the Commissioner misapplied the law.  The court noted Williams's overall employment record, the lack of evidence that other employees had been fired for similar conduct," the lack of "graduated warning, or discipline, for repeated offenses," and the undisputed fact that Williams "received false communications from a co-worker that he was clear to leave the dock."  CP at 245-46.  Relying on *Michaelson v. Employment Security Department*, 187 Wn. App. 293, 349 P.3d 896 (2015), the court determined that Williams's carelessness or negligence did not satisfy the definition of misconduct under the Act, and he should not have been denied unemployment benefits.  The Department appeals.

ANALYSIS

I.    LEGAL PRINCIPLES

"Washington's Administrative Procedure Act (APA), chapter 34.05 RCW, governs judicial review of unemployment benefits decisions."  *Michaelson*, 187 Wn. App. at 298.  Under the APA, a reviewing court may reverse an administrative decision if: "(1) the administrative decision is based on an error of law; (2) the decision is not based on substantial evidence; or (3) the decision is arbitrary or capricious."  *Tapper v. Emp't Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993); RCW 34.05.570(3).

We review the Commissioner's decision, not the determinations of the ALJ or the superior court.  *Markam Grp., Inc. v. Dep't of Emp't Sec.*, 148 Wn. App. 555, 560, 200 P.3d 748 (2009).  To the extent that the ALJ's findings and conclusions are adopted by the Commissioner, we review them.  *Griffith v. Dep't of Emp't Sec.*, 163 Wn. App. 1, 6, 259 P.3d 1111 (2011).  We consider the

---

[3] The discussion of the Superior Court's decision is for informational purposes.  In this case, we review the decision of the Commissioner, not the Superior Court's ruling.  *Markam Grp., Inc. v. Dep't of Emp't Sec.*, 148 Wn. App. 555, 560, 200 P.3d 748 (2009).

Commissioner's decision to be "prima facie correct." *Griffith*, 163 Wn. App. at 6. Williams, as the party asserting error, bears the burden of demonstrating invalidity. *Griffith*, 163 Wn. App. at 6.

We review the Commissioner's challenged factual findings "for substantial evidence in light of the whole record." *Smith v. Emp't Sec. Dep't*, 155 Wn. App. 24, 32, 226 P.3d 263 (2010). "Substantial evidence is evidence that would persuade a fair-minded person of the truth or correctness of the matter." *Smith*, 155 Wn. App. at 32–33. However, we do not review the Commissioner's witness credibility determinations. *W. Ports Transp., Inc. v. Emp't Sec. Dep't*, 110 Wn. App. 440, 449, 41 P.3d 510 (2002). We defer to factual decisions, viewing the evidence "in the light most favorable to the party who prevailed in the highest forum [with] fact-finding authority." *William Dickson Co. v. Puget Sound Air Pollution Control Agency*, 81 Wn. App. 403, 411, 914 P.2d 750 (1996). Here, that party is the Department. "Unchallenged findings of fact are [] verities on appeal." *Griffith*, 163 Wn. App. at 6.

We review the Commissioner's legal conclusions for legal error. *Griffith*, 163 Wn. App. at 6. "Whether an employee's actions constitute [disqualifying] misconduct is [] a mixed question of fact and law." *Markam*, 148 Wn. App. at 561. "When reviewing mixed questions of law and fact, we accept the Commissioner's unchallenged factual findings, apply the substantial evidence standard to the challenged findings of fact, independently determine the applicable law, and apply the law to the facts." *W. Ports Transp., Inc.*, 110 Wn. App. at 450. Thus, if we determine that substantial evidence supports the Commissioner's factual findings, we consider de novo whether the supported facts constitute disqualifying misconduct under the Act. *W. Ports Transp., Inc.*, 110 Wn. App. at 450; *Michaelson*, 187 Wn. App. at 299.

II.     EMPLOYMENT SECURITY ACT

The Act provides compensation to workers who are involuntarily unemployed "through no fault of their own." RCW 50.01.010. Discharged "workers are generally eligible for benefits" under the Act unless a statutory disqualification applies. *Griffith*, 163 Wn. App. at 8. The Act's benefits provisions "shall be liberally construed for the purpose of reducing involuntary unemployment." RCW 50.01.010. Accordingly, we approach "with caution any construction [of the benefits statute which] would narrow the coverage of the unemployment compensation laws." *Shoreline Cmty. Coll. Dist. No. 7 v. Emp't Sec. Dep't*, 120 Wn.2d 394, 406, 842 P.2d 938 (1992).

If an employee is discharged for misconduct, he or she is not entitled to unemployment benefits. RCW 50.20.066(1). The Act provides four categories of disqualifying misconduct:

> (a) Willful or wanton disregard of the rights, title, and interests of the employer or a fellow employee;
> (b) Deliberate violations or disregard of standards of behavior which the employer has the right to expect of an employee;
> (c) Carelessness or negligence that causes or would likely cause serious bodily harm to the employer or a fellow employee; or
> (d) Carelessness or negligence of such degree or recurrence to show an intentional or substantial disregard of the employer's interest.

RCW 50.04.294(1).

Within the first category of misconduct, the Act identifies a non-exhaustive list of actions that constitute *per se* misconduct. RCW 50.04.294(2). This list includes, as relevant here, "[v]iolation of a company rule if the rule is reasonable and if the claimant knew or should have known of the existence of the rule." RCW 50.04.294(2)(f).

Within the third and fourth categories of misconduct, "[c]arelessness" and "negligence" are defined as a "failure to exercise the care that a reasonably prudent person usually exercises." WAC 192–150–205(3).

Finally, the legislature expressly excluded the following acts from the definition of misconduct:

> (a) Inefficiency, unsatisfactory conduct, or failure to perform well as the result of inability or incapacity;
> (b) Inadvertence or ordinary negligence in isolated instances; or
> (c) Good faith errors in judgment or discretion.

RCW 50.04.294(3).

III.     CHALLENGED FINDINGS OF FACT

The Commissioner adopted all of the ALJ's findings of fact, and made one additional finding of fact relating to the credibility of witnesses. Williams challenges 13 of the ALJ's findings of fact, as well as the Commissioner's additional finding of fact. The Department argues all findings of fact are supported by substantial evidence. "Substantial evidence is evidence that would persuade a fair-minded person of the truth or correctness of the matter." *Smith*, 155 Wn. App. at 32–33.

Williams does not present individualized arguments in support of each challenged finding. Instead, Williams's argument divides the findings of fact into two categories, those related to witness credibility and those related to the door check policy. Because we do not review the fact finder's witness credibility determinations, we do not address them. *W. Ports Transp., Inc.*, 110 Wn. App. at 449. With respect to the policy, Williams asserts that the "record lacks substantial evidence to support the findings that Old Dominion implemented, communicated, and consistently enforced the 'door check' policy." Br. of Resp't at 16.

A.     Implementation

The finding that Old Dominion implemented a door check policy is supported by substantial evidence. The policy added hostlers to the line of responsibility for ensuring the safe

8

movement of trailers by requiring a visual check of the trailer door after the dockworker secured it and after the supervisor approved the move order. Williams correctly points out that the policy was not in writing, not posted in the workplace, and not distributed in an employee handbook. However, these arguments speak to communication of the policy, not to its existence.

B. Communication

The finding that Old Dominion communicated the door check policy to its employees is also supported by substantial evidence. Witnesses testified that Old Dominion's supervisor briefed employees on the door check policy at monthly safety meetings. The supervisor also testified that at the time of the policy change, in late 2013 or early 2014, he communicated the door check policy to each hostler individually.

Although Williams challenges all findings of fact relating to communication of the policy, he does not argue that the policy was not communicated at all. Instead, Williams argues that he was not personally told of the door check policy as it applied to hostlers.

It is uncontested that Williams did not regularly attend safety meetings, because they were typically scheduled during times when hostlers worked. Nevertheless, Williams acknowledges he attended some safety meetings. Although dockworker safety meetings likely discussed the policy from the dockworkers' perspective, witnesses stated the policy applied to dockworkers, supervisors, and hostlers. According to one dockworker, "the most crucial point" made at safety meetings was that "the dock worker was responsible for shutting the [trailer] door." CP at 91. Moreover, the Old Dominion supervisor communicated the policy to hostlers individually. There is substantial evidence that Old Dominion communicated the policy and that Williams, who worked at Old Dominion as a dockworker prior to assuming his role as a hostler, knew about the door check policy.

C.      Enforcement

Williams challenges whether substantial evidence supports the finding that the policy was "consistently enforced." Br. of Resp't at 16. There is no such finding. While it is uncontested that Old Dominion enforced the policy against Williams, no finding of fact addresses enforcement beyond Williams's discharge. However, the record is clear that the policy was not consistently enforced prior to the September 2015 incident.

Old Dominion acknowledged that implementation of the policy did not immediately cure employees of their "bad habits." CP at 53. The supervisor described an inevitable period of adjustment, testifying that compliance with the door check policy was "like anything else . . . you work on it, work on it, work on it, and it finally gets perfected." CP at 53.

Prior to Williams's accident, hostlers would check the trailers if they saw or heard something unusual but they did not perform a visual check prior to every move. The record indicates the door check policy was violated "frequently," with one dockworker testifying that he witnessed trailers pulled with doors open or people still inside at least once or twice per day. Prior to September 2015, however, there is no evidence that these instances of noncompliance led to any accidents in which an employee received injuries or equipment was damaged. Prior to Williams's discharge, no employee was disciplined for violating the door check policy.

IV.      CHALLENGED CONCLUSIONS OF LAW

The Commissioner concluded that Williams's actions constituted disqualifying misconduct under both RCW 50.04.294(1)(a) and (1)(d). Specifically, the Commissioner concluded that Williams's failure to visually check the trailer door was in "willful and wanton disregard of the rights, title and interests of his employer" because it violated a known and reasonable employer policy. CP at 162. The Commissioner also concluded that Williams's conduct "evinced

10

carelessness or negligence *of such degree* as to show a substantial disregard of the employer's interest." CP at 162.

Williams argues his conduct constituted ordinary negligence or a good faith error in judgment, and thus was excluded from the definition of misconduct. We agree.

A.      Willful and Wanton Disregard of Employer's Interests

The definition of misconduct includes "[w]illful or wanton disregard of the rights, title, and interests of the employer or a fellow employee." RCW 50.04.294(1)(a). "'Willful' means intentional behavior done deliberately or knowingly, where [the employee is] aware [of] violating or disregarding the rights of [his or her] employer or co-worker." WAC 192-150-205(1). "'Wanton' means malicious behavior showing extreme indifference to a risk, injury, or harm to another" that the discharged employee either knew or should have known about. WAC 192-150-205(2).

We need not determine whether Williams's conduct was "willful or wanton" because he violated a reasonable rule or policy that he knew or should have known about. RCW 50.04.294(2)(f) provides that violations of reasonable rules that an employee "knew or should have known of" "are considered misconduct because the acts signify [ ] willful or wanton" misconduct under RCW 50.04.294(2).

Williams denies actual knowledge of the change in policy and argues the record does not establish he should have known. Williams cites WAC 192-150-210(5), which states the Department "will find" that an employee knew or should have known about a company rule if that employee was provided a rules orientation, a written copy of the rule, or if the rule is clearly posted in the workplace.

Williams's reliance on this WAC is unpersuasive. While it is true the door check rule was neither written nor posted, Old Dominion regularly discussed the rule at monthly safety meetings, the functional equivalent of an "orientation on company rules." Furthermore, the Department correctly points out that WAC 192-150-210(5) contains circumstances where the Department is required to find actual or constructive knowledge ("will find"), not an exhaustive list of circumstances where knowledge of an employer rule or policy may be found. Moreover, there "is no requirement in the [Act] or the Department's regulations that a company rule be written or contained in a handbook for its violation to constitute misconduct." *Daniels v. Emp't Sec. Dep't*, 168 Wn. App. 721, 729, 281 P.3d 310 (2012).

There is substantial evidence that Williams knew about the policy.[4] Old Dominion briefed employees on the door check policy at monthly safety meetings. Williams acknowledged that he attended some safety meetings. Williams worked as a dockworker for at least a year after the policy change, and had monthly opportunities to learn about the door check policy. CP at 37, 71-72.

Because Williams moved the trailer without performing a visual check of its doors, Williams did not comply with a reasonable policy he knew or should have known about. Therefore, unless a statutory exclusion applies, Williams's actions qualify as misconduct.

---

[4] The trial court made specific findings of fact that are verities on appeal or, to the extent they are challenged, which are supported by substantial evidence. *Darkenwald v. Emp't Sec. Dep't*, 183 Wn.2d 237, 244, 350 P.3d 647 (2015). "The policy change was verbally communicated to employees." CP at 142. The hostler supervisor "communicated the change directly to the hostlers, including [Williams]. CP at 142. The policy change "had been communicated to the claimant directly." CP at 145.

B.      Ordinary Negligence or Good Faith Error in Judgment

In keeping with the legislative directive that the Act be "liberally construed" in favor of granting benefits to involuntarily unemployed workers, the legislature expressly excluded certain conduct from the statutory definition of misconduct. RCW 50.04.294(3). As relevant here, "isolated instances" of "ordinary negligence" are excluded. RCW 50.04.294(3)(b).

In this context, "negligence" is defined as the "failure to exercise the care that a reasonably prudent person usually exercises." WAC 192-150-205(3);[5] *Michaelson*, 187 Wn. App. at 300-01. Because Williams's conduct amounted to an isolated instance of ordinary negligence, Williams's actions are excluded from the definition of misconduct under the Act.

*Michaelson* is instructive. In *Michaelson*, a truck driver was discharged after violating his employer's guidelines. He had three accidents within a twelve month period. The driver had notice of the guidelines, in writing, in the form of an employee handbook. The driver received warnings after each accident. The employer used progressive discipline which culminated in termination of his employment after the third crash. The Department denied the driver benefits, finding his discharge had resulted from misconduct. *Michaelson*, 187 Wn. App. at 296-97.

In reversing, *Michaelson* noted that the driver had only a single accident in the nine years prior to the year of discharge. The court determined the accidents did not "evidence the necessary misconduct to disqualify [the driver] from receiving unemployment benefits." *Michaelson*, 187 Wn. App. at 301-02. "At most Mr. Michaelson failed to exercise reasonable care, the care a

---

[5] WAC 192-150-205(3) also applies this definition to "[c]arelessness."

reasonably prudent person would have exercised in similar circumstances." *Michaelson*, 187 Wn. App. at 301. Because the driver's conduct was simply negligent, it did not qualify as misconduct under RCW 50.04.294(1)(d). *Michaelson*, 187 Wn. App. at 301-02.

The facts in this case appear less extreme than the accidents in *Michaelson*. The driver in *Michaelson* had four accidents in ten years. 187 Wn. App. at 301. Williams had two accidents in eight years. In *Michaelson*, all three chargeable accidents damaged equipment or vehicles. 187 Wn. App. at 297. In this case, Williams's previous incident resulted in no damage and the September 2015 accident resulted in repairable damage to a forklift. Neither Williams nor Michaelson caused any injuries.

As the Superior Court noted below, these facts do not demonstrate that Williams was "willful, reckless, or grossly negligen[t]." CP at 246. Like Michaelson's, Williams's conduct was likely negligent, but lacked the willful disregard for consequences to others normally associated non-ordinary negligence in the employment context. *Hamel v. Emp't Sec. Dep't*, 93 Wn. App. 140, 146, 966 P.2d 1282 (1998). "'[W]illful misconduct'" is beyond "mere negligence;" it requires "'reckless disregard of [the conduct's] probable consequences." *Hamel*, 93 Wn. App. at 146 (quoting BLACK'S LAW DICTIONARY 1600 (6th ed. 1990)). Although potentially negligent, Williams' failure to visually check a trailer he had already been told was safe did not recklessly disregard the possible risks of an accident. *See* WAC 192-150-205(3).

Unlike the driver in *Michaelson*, who received warnings and discipline regarding his employer's accident policy, this case is factually distinguishable. Here, the record reveals a clear pattern of nonenforcement.[6] It was the hostlers' standard practice to visually check some, but not all trailer doors prior to each move. Old Dominion tolerated this imperfect compliance with the door check policy. Even though hostlers moved trailers with unsecured doors on a daily basis, Old Dominion took no disciplinary action. Williams relied on the move order from both the dockworker and his supervisor telling him the trailer was safe to move; failing to check it himself amounted to no more than an isolated instance of ordinary negligence.

C.  Carelessness or Negligence Showing Intentional or Substantial Disregard of Employer's Interests

The Commissioner concluded without analysis that Williams's accident constituted disqualifying misconduct because it "evinced carelessness or negligence *of such a degree* as to show a substantial disregard of the employer's interest" under RCW 50.04.294(1)(d). CP at 162. WAC 192-150-205(3) defines both "negligence" and "[c]arelessness" as the "failure to exercise the care that a reasonably prudent person usually exercises." The Department agrees, arguing that Williams's actions rose above the "'ordinary negligence'" discussed in the previous section because they created danger in the workplace and potential liability for Old Dominion. Appellant's Response Br. at 26. Williams disagrees, again arguing that isolated instances of ordinary

---

[6] Williams cites *Albertson's v. Emp't Sec. Dep't*, for the proposition that violation of a routinely unenforced policy cannot be misconduct under RCW 50.04.294(1)(a). 102 Wn. App. 29, 15 P.3d 153 (2000). *Albertson's* on its own does not establish such a broad proposition. *Albertson's*, 102 Wn. App. at 38. Griswold had a supervisor's authorization. *Albertson's*, 102 Wn. App. at 33. The Department appropriately distinguishes *Albertson's* from this case because Griswold appeared to comply with an ambiguous policy, while Williams violated an unambiguous, albeit unenforced, employer policy. Nevertheless, *Albertson's* remains relevant for the proposition that a common employee practice, undertaken in clear view of and permitted by supervisors, is unlikely to be willful misconduct because the employee may not know the practice jeopardizes the employer's interests. 102 Wn. App. at 41-42.

negligence are excluded from the definition of misconduct under RCW 50.04.294(3)(b). We agree with Williams.

The Department argues that carelessness or negligence of "such a degree" to show misconduct under RCW 50.04.294(1)(d) may arise from a single instance. Appellant's Response Br. at 21. The Department relies on *Johnson v. Employment Security Department*, 64 Wn. App. 311, 824 P.2d 505 (1992). In *Johnson*, a bus driver's husband, without the driver's knowledge, placed a gun in her bag before she left for work. 64 Wn. App. at 313. The gun fell out of the bag during the driver's shift and was later found on the bus. *Johnson*, 64 Wn. App. at 313. The court in *Johnson* reasoned that the driver's failure to notice the gun, in combination with leaving the gun on the bus, "presented a clearly dangerous situation" in excess of ordinary carelessness or negligence. *Johnson*, 64 Wn. app. at 317.

*Johnson* is distinguishable from this case. In *Johnson*, the bus driver's action—carrying a loaded gun to work, then leaving that gun on a public bus—created a substantial risk commensurate to the seriousness of the weapon. 64 Wn. App. at 313, 317 (specifically recognizing a firearm as a "dangerous instrumentality for which strict liability is often imposed."). Here, there is no evidence that the hostlers' failure to adhere to the door check policy created a risk comparable to the safety threat posed by a loaded and unsecured firearm.[7]

The Department also relies on *Smith*, 155 Wn. App. 24. In *Smith*, a local government employee was discharged for disqualifying misconduct under RCW 50.04.294(1)(d) after recording conversations with co-workers and members of the public without their consent. 155 Wn. App. at 29, 36. Although Smith claimed to not be aware his employer had a policy against

---

[7] Williams also notes that *Johnson* is of limited use in interpreting the statutory meaning of misconduct because it predates RCW 50.04.294, and because *Johnson* relies on a less rigorous interpretation of misconduct that has since been superseded by statute.

16

the practice, *Smith* nevertheless concluded that the employee's actions disregarded his employer's interests by exposing the county to liability. 155 Wn. App. at 36-37.

As Williams points out, *Smith* is also distinguishable from this case. Recording conversations without two party consent went beyond "ordinary negligence" because it is an independent violation of law—specifically, the Washington Privacy Act. RCW 9.73.030(1)(b). In this case, the Department has not argued that Williams's conduct broke the law, nor would the record support such an assertion.[8]

The Department's argument that a single instance of carelessness or negligence may constitute misconduct under RCW 50.04.294(1)(d) is true, yet it misses the point. Although one instance of gross negligence may constitute misconduct under RCW 50.04.291(1)(d), it does not follow that a pattern of ordinary negligence automatically rises to the level of misconduct. *Michaelson*, 187 Wn. App. at 302 ("Three negligences do not make a misconduct.") (Fearing, J., concurring). Additionally, for a single act of carelessness to constitute misconduct under RCW 50.04.294(1)(d) the actions must "show an intentional or substantial disregard of the employer's interest." In this case, we have a single negligent act, consistent with the hostlers' customary practice. Williams's negligence was not to "such a degree" as to show an *intentional or substantial* disregard for his employer's interests.

---

[8] Furthermore, the Department asserts without support that Williams's conduct exposed Old Dominion to legal liability. Even if the forklift driver had been injured, Old Dominion would likely be shielded by the employer immunity provisions of the Industrial Insurance Act. RCW 51.04.010.

D.       Carelessness or Negligence Likely to Cause Serious Bodily Harm

For the first time on appeal, the Department also argues we should  decide that Williams's actions constituted disqualifying misconduct because they were likely to cause serious bodily harm to his employer or a fellow employee under RCW 50.04.294(1)(c).  Neither the ALJ nor the Commissioner determined that Williams engaged in misconduct on these grounds.  We need not address issues raised for the first time on appeal.  RAP 2.5.[9]

E.       Conclusion

This case asks us to determine, on a de novo basis, whether the supported facts constitute disqualifying misconduct under the Act.  *W. Ports Transp., Inc.*, 110 Wn. App. at 450; *Michaelson*, 187 Wn. App. at 299.  On this record, Williams's actions are excluded from the definition of misconduct.  In concluding that William's actions did meet the definition of misconduct, both the ALJ and the Commissioner failed to adequately acknowledge RCW 50.04.294(3)(b).  The supported facts in this case establish Williams's actions were negligent, but fall short of demonstrating the level of gross negligence or willful misconduct required for benefits disqualification under the Act.  Because isolated instances of ordinary negligence do not constitute misconduct as defined in the Act, the Commissioner's decision was based on a misapplication of law and should be reversed.

---

[9] Furthermore, RAP 10.3 requires parties to adequately support all arguments.  Here, the Department's argument is less than one page, with no relevant case citations and a single novel cite to the record.

49362-4-II

## V.     ATTORNEY FEES

We affirm the Superior Court's award of attorney fees.  RCW 50.32.160.

We reverse the Commissioner's decision.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

We concur:

_____
Worswick, J.

_____
Lee, A.C.J.